Roy Ronald LOWE, as Administrator of the Estate of Lou Ann Lowe, Deceased, Plaintiff-Appellant,

v.

GENERAL MOTORS CORPORATION, Defendant-Appellee.

Roy FULFORD, as Administrator of the Estate of Elva Fulford, Deceased, Plaintiff-Appellant,

v.

GENERAL MOTORS CORPORATION, Defendant-Appellee.

Nos. 77–2737, 77–2738.

United States Court of Appeals, Fifth Circuit.

Aug. 29, 1980.

Rehearing Denied Oct. 9, 1980.

Edward F. Morgan, Tuscaloosa Ala., C. O. Burkhalter, Gordo, Ala., for plaintiff-appellant Lowe.

Olin W. Zeanah, Wilbor J. Hust, Jr., Tuscaloosa, Ala., for plaintiff-appellant Fulford.

Charles A. Stewart, Jr., Birmingham, Ala., Gen. Motors Corp., Detroit, Mich., Otis M. Smith, Eugene D. Martenson, Birmingham, Ala., for defendant-appellee.

Before BROWN, HILL and RANDALL, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is a products liability action which arose out of an accident involving a 1971 Chevrolet Impala in which the steering mechanism unexpectedly locked causing the automobile to go out of control. The result was the death of Mrs. Elva Fulford and her daughter, Mrs. Lou Ann Lowe. The husbands of the decedents brought this action against the manufacturer, General Motors Corporation (GM), based upon the Alabama Wrongful Death Statute, 1975 Ala.Code sec. 6–5–410 (formerly 1958 Ala.Code, tit. 7, sec. 123). The plaintiffs alleged that negligence per se was established by GM's violation of the National Traffic and Motor Vehicle Safety Act of 1966 (MVSA), 15 U.S.C.A. § 1402 (1974) (current version at 15 U.S.C.A. § 1411 (West Supp. 1980)).

After hearing the evidence, a jury rendered a verdict for the plaintiffs in the amounts of $500,000 each. The District Court, however, ordered a new trial, reason-

ing that allowing evidence of any violation by GM of the MVSA to establish negligence per se was the equivalent of allowing a direct cause of action under the MVSA, contravening the holding of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

The District Court held, in the alternative, that the verdicts were "excessive and demonstrat[ed] prejudice, bias and passion," and that if this were the only issue the court would have required a new trial unless the plaintiffs agreed to a remittitur of $250,000. The District Court was also of the opinion that even if a cause of action existed under the MVSA, there was a failure to prove proximate cause between the violation of the Act and the accident.

At the second trial, no evidence of violation of the MVSA was admitted, and the jury rendered a verdict for the defendants. The plaintiffs now appeal and we vacate the order granting a new trial and the judgment in the second trial and remand for reinstatement of the first verdict.[1]

### I. The Facts

In the early morning of September 17, 1973, Mrs. Fulford drove to pick up her daughter, Mrs. Lowe, at the daughter's home in Gordo, Alabama, to bring her back to her own home in Tuscaloosa to spend a few days. In order to get to her daughter's house Mrs. Fulford, driving a 1971 Chevrolet Impala, had to travel on a gravel road.

At approximately 9:30 a. m., after picking up her daughter, the two were headed back to Mrs. Fulford's house along a paved level highway, U.S. Highway 82. It was a clear, dry day. Traveling at about 50 miles per hour, they overtook and passed the automobile operated by John Calvin Davis. To do so, Mrs. Fulford went into the left lane and then, after she had overtaken the car, back into the right lane, straightening her course. Davis testified that suddenly the Fulford automobile inexplicably angled to the left again, crossed the highway, trav-

eled along the shoulder of the road for a distance, and then overturned down an embankment.

A witness to the accident, J. C. Champion, was told by Mrs. Fulford, as she lay injured in the automobile, that the car had suddenly become impossible to steer. Mrs. Fulford died in the ambulance on the way to the hospital. Mrs. Lowe died in the hospital a few days later.

Chester Bambarger, the wrecker driver who towed the automobile away, examined it and determined that the steering was indeed locked. Upon a more careful examination of the undercarriage, he and an Alabama State Trooper, C. W. Barrentine, found a stone lodged inside the steering coupling.

### II. The Proceedings Below

At trial the plaintiffs asserted two theories of negligence on the part of GM—first, defective design of the automobile and second, failure to adequately warn the public of this defect.

With respect to the first theory of negligence, engineering expert for the plaintiffs, Dr. Sachs Hanagud, made an independent study of the vehicle and concluded that there were two related causes for the accident: (1) blocked steering due to the stone interference problem in the steering coupling which resulted in (2) the fracture of a tooth of the Pitman shaft caused by metal fatigue and the stress applied to unjam the steering mechanism. It also was his opinion that the uncovered design of the steering coupling was an unsafe engineering design because it allowed rocks to fly up into the bottom of the car and possibly lodge between the coupling and the frame, causing the steering to jam.

Expert witness for the defense, Dr. Julian Doughty, was of the opinion that no stone interference problem caused this accident. Another expert witness for the defense, Dr. Alfred D. Droulillard, was of the

---

1. The procedure of reinstating a jury verdict in a first trial, due to an erroneous granting of a second trial, was recently used by Judge Gee in

*Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360 (5th Cir. 1980).

opinion that the tooth of the Pitman shaft fractured, not because of metal fatigue, but on impact at the time of the accident, possibly, the defense asserts, when the vehicle may have hit a concrete abutment as it overturned.

Fulford and Lowe also contended that GM failed to give the public proper warning of these defects upon their discovery, in violation of 15 U.S.C.A. § 1402(a), in effect at the time of the accident, which stated:

> Every manufacturer of motor vehicles or tires shall furnish notification of any defect in any motor vehicle or motor vehicle equipment produced by such manufacturer which he determines, in good faith, relates to motor vehicle safety, to the purchaser (where known to the manufacturer) of such motor vehicle or motor vehicle equipment, within a reasonable time after such manufacturer has discovered such defect.

They claimed that GM violated this statute in three ways, in (i) the untimeliness of the notice, (ii) its inadequacy in describing the amount of danger the defect created, and (iii) GM's failure to provide enough steering coupling shields for all the automobiles subject to the recall campaign.

First, the notice was not given within a reasonable time after the defect was discovered. In 1971, GM learned that it was possible for a stone to become lodged between the steering coupling and the frame, resulting in partial loss of steering control. All Chevrolet dealers were mailed notice of this defect on May 19, 1972, but a recall campaign of all 1971 and 1972 Chevrolet automobiles equipped with power steering, with notice to individual owners, was not commenced until March 1973.

Second, Fulford and Lowe alleged that the notice was inadequate. The letter sent to Chevrolet owners urged them to have a steering coupling shield installed by their dealers at no extra cost, "to prevent the possibility of a partial loss of steering control. . . ." The letter went on to say that

> [s]uch an incident could occur when you drive your car on an unpaved road surface if a stone should be thrown up into the engine compartment where it can lodge between the steering coupling and the frame. If this should happen, it may cause increased steering effort or interference with steering control of your car. It is possible that it could even result in a partial loss of steering control.

The notice did not say that it was possible for a stone to become lodged *inside* the steering coupling, possibly resulting in a *total* loss of steering.

Third, the notice was inadequate because GM did not make steering coupling shields available at their dealerships in numbers sufficient to implement the recall campaign. As of October 27, 1973, GM had manufactured only 64,277 shields for the more than 3,700,000 1971 and 1972 models subject to the recall program. The morning after Mr. Fulford received the recall notice, he went to the Chevrolet dealer in Tuscaloosa, but the dealer did not have any steering coupling shields. He went back once or twice more, but there were still no shields. Mr. Fulford also tried to get the shield from dealers in cities in Florida, Georgia, North Carolina and South Carolina, but no one had them. In all, Mr. Fulford went to no less than 13 different dealerships throughout the south, and none of them had the shields.

In its instructions to the jury in the first trial, the District Court included the following charge:

> The plaintiffs however further contend that the defendant was negligent in the handling of its recall campaign. Congress has passed what is known as the Motor Vehicle Safety Standards Act. This act in pertinent parts provide (sic) that every manufacturer of motor vehicles shall notify the purchaser of that vehicle of any defect which the manufacturer in good faith determines to exist if the defect relates to motor vehicle safety. The manufacturer is required to do this within a reasonable time after he discovers it. He is also required to give information to the purchaser about methods of correcting the defect. Motor vehi-

cle safety is defined as the performance of motor vehicles in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction and performance of the vehicle and is also protected against unreasonable risks of death and injury in the event of an accident.

This act creates the duty on the part of the manufacturer to notify the purchasers of the existence of defects which a manufacturer determines in good faith relate to vehicle safety and to detail the measures to be taken to repair it. This duty arises whether the defect results from negligence or not.

Now, if the defendant fails to exercise reasonable care in notification to the public, including the owner of this vehicle and in directing ways to correct it, then there would be negligence on the part of the defendant. If you are reasonably satisfied from the evidence that the defendant failed to use reasonable care in carrying out the notification responsibility of the statute then you should find that the defendant was negligent in this respect. If, however, you are not reasonably satisfied from the evidence that the defendant failed to use ordinary care in notifying the plaintiff Fulford of the defect then you should find that the defendant was not negligent.

After the jury rendered a verdict of $500,000 for each of the plaintiffs, GM filed a motion for j.n.o.v. or in the alternative for a new trial. The District Court denied the motion for j.n.o.v. but granted the motion for a new trial, reasoning that the foregoing jury charge intimated that violation of the MVSA was negligence per se and thereby amounted to the allowance of a private right of action under the MVSA. Relying on the four guidelines set forth in *Cort v. Ash, supra,*[2] the District Court concluded that there was no private remedy for negligence under the MVSA.

The Court went on the say that

evidence of negligence in the recall campaign is admissible on the issue of a manufacturer's design and manufacturing responsibilities including the duty to warn. *Nevels v. Ford Motor Company,* 439 F.2d 251 (5th Cir. 1971); *Larsen v. General Motors Corporation,* 391 F.2d 495 (8th Cir. 1968). The essence of the claim is negligence and failure to carry out the statutorily imposed duties is evidence of negligence.

\* \* \* \* \* \*

This is different however from saying that the Act created a separate right of action. Evidence of negligence in the recall campaign *per se* will not support a cause of action for damages. It is really an extension of the common law duty to warn, as plaintiffs' briefs suggest. Accordingly, the Court is of the opinion that it was error to submit the issue to the jury on an independent theory of liability under the Act.

At the second trial, however, the District Court disallowed the introduction of any evidence pertaining to reports and complaints to GM dating back to January 1, 1971, concerning the stone interference problem, GM's remedial action with regard to this problem, Fulford's unsuccessful attempts to secure a steering coupling shield for his car, the recall campaign and correspondence with the Department of Transportation, and Dr. Hanagud's testimony

2. In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," [citations omitted]—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? [Citations omitted.] Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Citations omitted.] And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [Citations omitted.]
*Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2087–88, 45 L.Ed.2d at 36.

concerning his opinion on the cause of the accident. The Court then granted GM's motion for a directed verdict on plaintiff's theory of failure to warn, or to timely warn, of the stone interference problem and its dangers. The jury rendered a verdict for GM.

### III. The Motor Vehicle Safety Act—A Private Right Of Action Or Evidence Of Negligence Or Negligence Per Se?

We conclude the District Court misinterpreted or misapplied the Supreme Court decision in *Cort v. Ash* when it used that decision as the basis for granting defendant's motion for a new trial. In *Cort v. Ash*, jurisdiction over the plaintiff's claim was founded on 28 U.S.C.A. § 1331 as a claim arising under a Federal statute. The Federal statute under which the plaintiff alleged his claim arose was 18 U.S.C.A. § 610, a criminal statute which provided no civil remedy. The second count of the complaint presented a state law claim, but this was independent of the claim under § 610. Jurisdiction over this state claim was pendent to that of the Federal claim but was not based on § 610 directly. Thus, the very existence of the case in Federal Court depended on the theory of a private right of action which, the plaintiff asserted, arose under § 610.

The case before us today presents quite a different situation, procedurally and substantively. It was brought in Alabama State Court as an action based on the Alabama Wrongful Death Statute. It was removed to Federal Court because diversity jurisdiction existed. 28 U.S.C.A. § 1332 (West 1966 and West Supp. 1980). Fulford and Lowe never asserted Federal jurisdiction based on § 1331, arising under any Federal statute. Although the MVSA and its application might have significance or bearing on the case, the suit was not to enforce the MVSA, nor would an application one way or the other necessarily have had decisive consequences.

Fulford and Lowe made it quite clear that the only relationship the alleged violation of the MVSA had to this case was simply as evidence of GM's negligence. The concept that violation of a criminal or penal statute can be evidence of negligence in a civil action is not new to tort law. "[I]t is said that the reasonable man would obey the criminal law, and that one who does not is not acting as a reasonable man, and therefore must be negligent." W. Prosser, Law of Torts 191 (4th ed. 1971) (footnote omitted).

"Motor vehicle safety" is defined in the MVSA as

> the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against *unreasonable* risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against *unreasonable* risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles.

15 U.S.C.A. § 1391(1) (1974) (emphasis added.) Thus, the Act creates a duty upon the automobile manufacturer to construct his product to be "reasonably" safe. Under § 1402, it was also "reasonable" for the manufacturer promptly to notify the owners of his product of any safety-related defect and how to remedy it.

This Court has often held that violation of a Federal law or regulation can be evidence of negligence, and even evidence of negligence per se. *See, e. g., Reyes v. Vantage Steamship Company, Inc.,* 609 F.2d 140, 143 (5th Cir. 1980) (Coast Guard regulations); *Manning v. M/V "Sea Road,"* 417 F.2d 603, 608 (5th Cir. 1969) (Safety and Health Regulations for Longshoring).

The mere fact that the law which evidences negligence is Federal while the negligence action itself is brought under State common law does not mean that the state law claim metamorphoses into a private right of action under Federal regulatory law. In *Nevels v. Ford Motor Company,* 439 F.2d 251 (5th Cir. 1971), a negligence action under Georgia law, we held that violation of § 1402 "was relevant [evidence] not only with respect to the statutory duty of Ford, but also in regard to

plaintiff's contention of negligent assembly in the manufacturing process." *Id.* at 258. Once this evidence was submitted to support the plaintiff's assertion of negligence, the issue should go to the jury. *Id. See Chrysler Corporation v. Department of Transportation,* 472 F.2d 659, 670 n.13 (6th Cir. 1972); *see also Todd v. United States,* 384 F.Supp. 1284, 1294 (M.D.Fla.1975); *Florida Freight Terminals, Inc. v. Cabanas,* 354 So.2d 1222, 1225 (Fla.App.1978) (Federal Air Regulations evidence of negligence under Alabama law and Florida law respectively).

*Nevels, supra,* held that violation of the MVSA was evidence of negligence, but did not specifically hold that it was evidence of negligence per se. However, that case relied on Georgia law to determine negligence. "In this diversity action, we are bound by Georgia law with respect to the measure of care owed by the manufacturer to a third person." 439 F.2d at 255.

Turning to Alabama law in the diversity case before us, we find that it states that violation of a statute is negligence per se if the following criteria are met:

(1) The trial judge must determine as a matter of law that the statute was enacted to protect a class of persons which includes the litigant seeking to assert the statute.

 \*    \*    \*    \*    \*    \*

(2) The trial judge must find the injury was of a type contemplated by the statute.

 \*    \*    \*    \*    \*    \*

(3) The party charged with negligent conduct must have violated the statute.

 \*    \*    \*    \*    \*    \*

(4) The jury must find the statutory violation proximately caused the injury.

*Fox v. Bartholf,* 374 So.2d 294, 295–96 (Ala. 1979) (citations omitted).

■ We conclude that under *Fox* violation of the MVSA is evidence of negligence per se in Alabama. The purpose of the MVSA "is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents," by "establish[ing] motor vehicle safety standards for motor vehicles . . .." 15 U.S.C.A. § 1381. Thus, it is clear that Mrs. Fulford, as the driver, and Mrs. Lowe, as the passenger, of the automobile whose manufacturer was subject to the Act, were, as a matter of law, within the class of persons protected. And the trial judge so held in his order granting a new trial, even if it was with respect to the first criterion of *Cort v. Ash.* See note 2, *supra.* The trial judge also stated that "[t]he Act was clearly designed to reduce traffic accidents and the resulting deaths and injuries." Therefore, the danger which caused their deaths [3] was allegedly the type the Act guards against.

■ Whether the statute was violated and whether that violation proximately caused the injury were questions of fact for the jury. After the first trial, the District Court judge gave proper instructions to the jury on these two issues and in their general verdict the jury implicitly answered both questions in the affirmative. Thus, all four of the *Fox* criteria for finding negligence per se were satisfied.

■ We find another indication, within the Act itself, that its violation is evidence of negligence per se in a tort action. 15 U.S.C.A. § 1391(2) states:

"Motor vehicle safety standards" means a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria.

To say that violation of a statute is negligence per se is to say that "an unexcused violation is conclusive on the issue of negli-

---

**3.** The defendants contested the fact that the accident had caused Mrs. Fulford's death, although they admitted it had caused the death of Mrs. Lowe. Causation of Mrs. Fulford's death was an issue of fact submitted to the jury at the first trial. In awarding Mr. Fulford a $500,000 verdict, the jury implicitly found that Mrs. Fulford's death was indeed caused by the accident.

gence." *Prosser, supra* at 200. If the statute in question creates a minimum standard of care, as it does here, then an unexcused violation, an act done with less than minimum care, would have to be negligence.

■ We conclude that the jury charges in the first trial on violation of the MVSA as evidence of negligence per se were correct, and that *Cort v. Ash* was not at all at issue in this case. Since evidence of GM's violation of the MVSA was relevant and properly admissible, the verdict of the second trial, in which no evidence of this violation was admitted, cannot stand. We believe the proper action to take is to reverse the order granting a new trial and remand to reinstate the jury verdict of the first trial, at least as to the issue of negligence.

### IV. Causation

Disposing of the *Cort v. Ash* issue, the principal ground on which the District Court relied in granting a new trial, we must face the first of the Court's other two comments concerning the jury verdict. These comments, appearing in the order granting a new trial, were dicta at the time. But on remand they must be addressed to determine whether the first verdict is to be reinstated in whole or in part.

With respect to the theory of liability due to GM's negligence in conducting a recall campaign pursuant to the MVSA, the District Court commented that "even if a cause of action exists under the statute there was a failure of proof [of] proximate cause and on that issue defendant would be entitled to a directed verdict."

We have already determined that no private right of action was at issue in this case. Since this comment was made after the jury rendered its verdict, we assume the District Court meant that but for a new trial it would have granted a j.n.o.v.

Our review of the comment on causation, therefore, will be under the same standard we would use if the District Court actually had granted a directed verdict or j.n.o.v. This standard, which applies in both Federal law and diversity cases, is set forth in *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

(Footnote omitted.) *Id.* at 374–75.

■ Under this standard we believe that there was sufficient evidence submitted for the trial court to allow the jury to determine whether GM's recall campaign gave inadequate warning of the danger to 1971 Chevrolet Impala owners and whether this was a proximate cause of the deaths of Mrs. Fulford and Mrs. Lowe.

The notice sent out to Impala owners warned them of "the *possibility* of a *partial* loss of steering control should a stone lodge between the steering coupling and the frame . . . ." (Emphasis added.) This accident involved a *complete* loss of steer-

ing control due to a stone lodged *inside* the steering coupling.

■ There is evidence to support GM's argument that they had never known a stone to lodge inside the steering coupling, and that in their experiments and tests, they had not been able even to get a stone to lodge in the steering coupling unless placed there by hand. GM argues that this implies they could not possibly have known of this risk and therefore had no duty to warn of this particular danger.

But making all the reasonable inferences in favor of the plaintiffs, we believe that there was sufficient evidence in their favor to let the issue go to the jury. The risk of partial loss of steering due to a stone lodged between the coupling and the frame and the risk of total loss of steering due to a stone lodged within the steering coupling are quite similar dangers. It is not unreasonable to infer that if GM knew of one risk, they might have known of the other. Thus, the jury's conclusion that the warning was inadequate is not unreasonable.

■ Of course, a finding of negligence through violation of the statute is only the first step. There must also be evidence that this negligence caused the accident. This is where we disagree with the District Court. The recall campaign letter instructed Mr. Fulford to procure from, and have installed by an authorized dealer, a coupling shield for the automobile. As outlined earlier, he exercised more than reasonable diligence in his efforts to do so and to make his car as safe as possible. We determine that from this and all the other pertinent evidence, the jury could reasonably have concluded that had the Lowes been warned of the extreme danger of a *complete* loss of steering, they would in all probability have

been just as diligent and completely refrained from driving the car.[4] Considering all the relevant evidence, we do not believe there was a failure to establish the link of causation between noncompliance with the MVSA and the accident itself.

### V. Prejudice And Passion, Or Only Generosity?

The District Court also commented on the size of the verdict awarded by the jury— $500,000 for each of the plaintiffs. The Court felt that these verdicts were "excessive and demonstrate[d] prejudice, bias and passion." The Court stated that, if this were the only ground on which to consider a new trial, he would have so ordered unless each plaintiff agreed to a remittitur of $250,000.

■ The damages awardable under the Alabama Wrongful Death Statute are strictly punitive. They are not designed to compensate the plaintiff for the decedent's loss of life, suffering, or pecuniary loss. *Bonner v. Williams*, 370 F.2d 301, 303 (5th Cir. 1966); *Alabama Power Co. v. Irwin*, 260 Ala. 673, 72 So.2d 300 (1954). "The punishment by way of damages is intended not alone to punish the wrongdoer, but as a deterrent to others similarly minded." *Liberty National Life Insurance Co. v. Weldon*, 267 Ala. 171, 100 So.2d 696, 713 (1957). The damages recoverable under this act, therefore, depend upon the "quality of the wrongful act and the degree of culpability involved." *Bonner, supra*, 370 F.2d at 303; *Irwin, supra*, 72 So.2d at 304.

■ The amount of damages to be awarded is largely within the discretion of the jury. *General Telephone Co. v. Cornish*, 291 Ala. 293, 280 So.2d 541 (1973); *Airheart*

---

4. The District Court states in its order that "[b]etween closing argument and charge, plaintiffs abandoned the theory of negligence in providing the means for correcting the defect." Whatever form the abandonment of this theory took, we cannot know since it was done off the record. The jury instructions did not mention this theory of negligence specifically. In referring to the evidence of Mr. Fulford's efforts to procure a steering coupling shield, we are not

attempting to reinstate a theory of negligence abandoned by the plaintiffs. Nevertheless, the evidence remained in the record and, as explained in the text above, is significant on the separate issue of causation.

We point out that the current version of the statute, 15 U.S.C.A. §§ 1411, 1413, 1414 (West Supp. 1980) requires an automobile manufacturer not only to inform the owner of the defect, but also to furnish the necessary remedy.

*v. Green*, 267 Ala. 689, 104 So.2d 687 (1958). However, this discretion is not absolute. *Airheart, supra*, 104 So.2d at 687; *Weldon, supra*, 100 So.2d at 713. Under Alabama law, the Court may set aside or reduce a verdict which it believes is not merely overly generous but so excessive that it demonstrates "bias, passion, prejudice, corruption or other improper motive or cause." *Airheart, supra*, 104 So.2d at 690.

While the state standard above would apply to the substantive issue of whether the verdict in this case was excessive, a Federal standard applies to determine the slightly different procedural question of whether a Federal District Court, sitting in diversity, should automatically grant a new trial on the basis of excessive damages. *Galard v. Johnson*, 504 F.2d 1198, 1200, n.1 (7th Cir. 1974); 11 Wright & Miller § 2802 (1973). And always lurking is the Seventh Amendment's guarantee of a jury trial. *See Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir. 1970), *modified*, 456 F.2d 180, *cert. denied*, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972).

Technically, the law in the Fifth Circuit is that if a Judge finds a jury verdict to result from passion or prejudice, the proper remedy is a new trial, and not remittitur. *Brabham v. State of Mississippi*, 96 F.2d 210, 213 (5th Cir. 1938); *Glazer v. Glazer*, 278 F.Supp. 476 (E.D.La.1968).

In more recent years, however, District Courts in this Circuit have been less hesitant to remit vast jury verdicts which they felt to be "grossly excessive" or "more than the law would permit," provided liability was clearly established. *Edward v. Sears, Roebuck & Co.*, 512 F.2d 276, 281–83 (5th Cir. 1975); *Gorsalitz v. Olin Mathieson Chemical Corp., supra*. District Courts have not hesitated to remit even punitive damages. *Gilbert v. St. Louis-San Francisco Railroad Co.*, 514 F.2d 1277, 1280–81 (5th Cir. 1975); *Curtis Publishing Co. v. Butts*, 351 F.2d 702, 718 (5th Cir. 1965). In these cases the remittiturs reduced the verdicts by one-half, two-thirds or even more.[5]

By suggesting that the verdicts in the case before us could be cured by remittiturs of $250,000 each, we conclude that the District Court did not really believe that a new trial on this issue was absolutely necessary due to bias, passion and prejudice. It was, instead, addressing the similar although distinct question of "just too much," that is, excessiveness. *Cf. Gulf Coast Building and Construction Trade Council v. F. R. Hoar & Son, Inc.*, 370 F.2d 746, 749 (5th Cir. 1967); *Curtis Publishing Co. v. Butts*, 351 F.2d 702 (5th Cir. 1965), *affirmed*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Therefore, we remand this case to the District Court with instructions to fix remittiturs appropriate under the governing law.

In determining the appropriate remittiturs, the District Court must heed the maximum recovery rule, the standard set forth in *Glazer, supra* and adopted by this Circuit in *Gorsalitz, supra* :

> In proceeding to fix the remittitur, then, the Court will be guided by the principle that the plaintiff who has been awarded an excessive amount by one jury should have the option of taking the maximum amount that the jury could properly have awarded or of taking a new trial before another one. In determining this, it appears proper first to fix the amount that [the District] Court thinks a properly functioning jury would have awarded, and this may be merely another way of saying that the starting point is the amount of damages the Court itself thinks proper on the record under the mandate of the Court of Appeals. After that, the maximum recovery rule requires the Court to determine the maximum amount of deviation from that verdict that could be allowed without requiring a new trial.

*Glazer, supra* at 482. Any remittitur accepted by the plaintiffs would not be appealable *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d

5. *Edwards*—$900,000 reduced to $450,000. *Gorsalitz*—$1,380,000 reduced to $690,633.

*Curtis*—$3,000,000 reduced to $400,000. *Gilbert*—$225,000 reduced to $60,000.

**1384**

112 (1977); *Krahn v. B. F. Goodrich Co.*, 559 F.2d 308 (5th Cir. 1977). Of course, if the plaintiffs refuse to remit, the District Court may order a new trial strictly on the issue of damages. *See Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 47 (5th Cir.), *cert. denied*, 409 U.S. 950, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972).

### VI. Conclusion

Thus, we vacate the District Court's order granting a new trial and the judgment of the second trial. We reinstate the verdict of the first trial as to liability, negligence, and proximate cause of some damages and the District Court shall enter a judgment in accordance with that verdict, with whatever remittitur, if any, as it deems appropriate under *Gorsalitz*. If plaintiffs decline to make the remittitur, then the District Court may order a new trial solely on the issue of damages.

VACATED and REMANDED.