### 74706. CLEGHORN v. CITY OF ALBANY.
(362 SE2d 386)

BIRDSONG, Chief Judge.

Marita Cleghorn sued the City of Albany for injuries allegedly sustained in the Albany Civic Center, when following an intermission at a concert she fell down an unlighted stairway. The trial court granted summary judgment to the City on the basis of governmental immunity under OCGA § 36-33-1. Cleghorn appeals. *Held*:

1. The disputed issue, at bottom, is the significance of the language in *Cornelisen v. City of Atlanta*, 146 Ga. 416, 419 (91 SE 415), in interpreting the meaning of "ministerial" acts not entitled to immunity under OCGA § 36-33-1, to the effect that "if the city, *having charter authority, maintain the park primarily as a source of revenue*, the duty of maintaining it in a safe condition for the use for which it is intended would be ministerial, and municipal liability would attach for breach of such duty." (Emphasis supplied.)

The appellant Cleghorn contends there is no governmental immunity in this case because the City of Albany has charter authority to operate the facility, and did in fact and by authority of city ordinance operate the Civic Center primarily as a source of revenue; that is, she contends the issue is whether the Civic Center was intended to make a profit. However, the City argues the language from *Cornelisen*, quoted above, and other cases removes immunity only if the

---

City has more or less express authority granted in the charter to operate the facility primarily as a source of revenue.

Accepting for the moment as the standard regulating the loss of immunity, a charter-granted power to raise general revenues for use by the City, the precise meaning and application of the *Cornelisen* language is crucial here because while there is a charter giving the City of Albany the authority to operate the Civic Center and requiring the city manager to "remain responsible for the proper use" of that authority, the charter itself does not make clear whether it is to be operated "primarily as a source of revenue," or for the purpose of sustaining the operation of the civic center from self-generated funds for the public good. There is a detailed city ordinance which among other things provides for the "protection policy" of the Civic Center, protection being defined as "the ability to regulate rental of the Civic Center facility . . . to ensure the maximum net revenue from the facility to the City and promoters." The ordinance further provides that among the criteria for establishing protection there shall be included a determination of "which events are best suited financially for the Civic Center and will provide the highest net revenues. . . . Reputation of event (including profitability) . . . [and] [n]et revenue from concessions." Further, the ordinance provides: "There will be no free use of the Albany Civic Center."

The City says, and the trial court evidently found, that whether the Civic Center was in fact intended to make a profit ("net revenues"), was operated to make a profit, or did make a profit, is not the point; but that the sole determination to be made is whether *the charter* gives authority to operate the facility "primarily as a source of revenue," under *Cornelisen.* Obviously the charter does not make such a provision. Thus the court in reality addressed the question of whether the City was acting within the powers granted by the charter or was acting in excess or outside the charter powers and thus *ultra vires.*

We find that the power to make a profit is not the meaning of the statement in *Cornelisen* at p. 419, that *"if the city, having charter authority, maintain the park primarily as a source of revenue,* the duty of maintaining it in a safe condition for the use for which it is intended would be ministerial, and municipal liability would attach for breach of such duty." (Emphasis supplied.) This language originated in *Cooper v. Mayor &c. Athens,* 53 Ga. 639-640 where the suit was for negligence in maintaining a ferry. The Supreme Court held that since the City had no authority to operate a ferry at all, neither by charter nor by special statute, the operation of it was *ultra vires,* and therefore the City could not be held liable for negligence in its operation. The distinction was made that "in order to charge a corporation in an action on the case for negligence in the performance

of a public work, the law must have imposed a duty or conferred the power to do such work. A clear distinction is drawn in the authorities between cases *where the act done is within the scope of the corporate powers as given by the charter or by special statute* (emphasis supplied), and those cases where it is clearly *ultra vires*, and not within the power of the corporation to act in reference to the matter at all. If the act complained of be not in this sense *ultra vires*, that is, if it be within the scope of such duties and powers as are prescribed by law, the corporation is liable for the negligence of its servants in their performance of such duties and powers. But if such wrongful act is outside of its special or general powers, it is not liable, whether it was done by command directly of the corporate authorities, or resulted from the negligence of its officers in the performance of such unauthorized work."

The court in *Cooper* further distinguished this principle involving a wrongful act done outside the City's powers from the case of *Mayor &c. of Savannah v. Wilson & Gibson*, 49 Ga. 476, where the City "had the power by law to establish and erect a market house, but not in the street where it had temporarily erected one. In exercising the authority granted them, they abused it to the injury of some of the citizens, and were held liable." The court described the Savannah case and others similar as cases arising from "illegal acts, but which spring from matters or transactions within the general or special powers of the corporation." But the acts sued for in *Cooper*, it was held, were clearly *ultra vires*, "outside of and beyond any power or duty conferred on the corporation, and was not done in the performance of such duty or powers as is directly granted, or which was within the scope of those which are conferred."

Therefore, the objective question is further refined to one of not whether the charter expressly grants authority to operate the facility for a profit, but rather whether, according to *Cooper*, the City has authority by charter or special statute, to operate the particular facility at all. But we must note yet another distinction. In *Cornelisen*, p. 418, the court further declared that the doctrine of immunity under the statute, "has no application where the duties, under proper charter authority, relate to branches of municipal endeavor which are private in their nature, primarily for revenue and promotion of municipal welfare." The *Cornelisen* court related the case of *Mayor &c. of Savannah v. Cullens*, 38 Ga. 334, wherein it was said: "[The markethouse maintained by the City in which it rented stalls to vendors of marketable produce] 'was the property of the corporation, from which it derived a revenue in the way of rents. Why was it not just as much bound to keep that safe as a merchant is the floor of his store? To keep the market in a safe condition, it being property, and used by the city for its revenues, was a private duty.' "

Thus *Cornelisen* extended the scope of inquiry of *Cooper* beyond the question of whether the City had authority to operate the facility or activity to whether the facility or activity was operated "primarily . . . as a place of resort for pleasure and promotion of health of the public at large [a public function] . . . [or] primarily as a source of revenue [a ministerial function]." Id. p. 419. Nevertheless, some cases have inferred, out of context, that the *Cornelisen* statement, "But if the city, having charter authority, maintain the park primarily as a source of revenue, [liability attaches]," means that in order for operation of a facility to be a ministerial function the city charter must expressly provide authority to operate the facility primarily as a source of revenue. See, e.g., *Pollock v. City of Atlanta*, 88 Ga. App. 737 (77 SE2d 579); *Watkins v. City of Toccoa*, 55 Ga. App. 8 (189 SE 270); *Petty v. City of Atlanta*, 40 Ga. App. 63 (4) (148 SE 747). These cases do not control for they ignore the possibility of a purely public function.

*City of Atlanta v. Mapel*, 121 Ga. App. 567 (174 SE2d 599) involved a boy who suffered severe and permanent brain injury on being struck by a golf ball at a city golf course. We acknowledged the confusing and often uneven judicial treatment of these cases, and quoted *Cornelisen* as providing a "consistent key" in Georgia. But the "key" was not stated as whether the city charter granted authority to operate the facility as a source of revenue, because it seemed obvious that "[c]ities don't operate facilities *primarily* as a source of revenue, and the legislature does not ordinarily give this kind of charter authority." We concluded it was "fundamental that any city activity or operation is carried on *primarily* for the public benefit, even if for only a limited segment of the public," and therefore found "patently ridiculous" the distinction *inferred* from *Cornelisen* to immunize only activities authorized by charter to be operated "primarily as a source of revenue." Finding no such express authority, we affirmed the grant of summary judgment to the City. More recently, in *Johnson v. City of Atlanta*, 171 Ga. App. 296 (319 SE2d 506), we eschewed reliance solely upon the city charter and, consistent with *Cornelisen*, focused on the fact that Grant Park Recreation Center, when a child was injured at summer camp, was maintained "primarily for the public benefit" (see *Cornelisen*, p. 419) and not primarily as a source of revenue, and thus affirmed the bar of immunity.

It is clear that if a facility or activity is operated primarily as a source of revenue, its governmental immunity is lost along the way to business-as-usual, as in the case of the Savannah produce market. *Mayor &c. of Savannah v. Cullens*, supra; *Cornelisen*, supra, p. 418. Whether the enterprise turns a profit, or only an incidental profit (*Cornelisen*, p. 419) is not the controlling point; what is significant is the character of the facility as "primarily a source of revenue" rather

than being used primarily for the benefit of the public regardless of incidental generation of revenues. As we recognized in *City of Atlanta v. Mapel*, supra, legislatures and city councils will seldom give this kind of charter authority; but it is not uncommon that a City will operate a facility or enterprise primarily as a source of revenue and this might be proved by the facts themselves even without a "special statute" urging its operation for "net revenues," "profitability," and "to ensure the highest possible revenue," as in this case. Moreover, the better question is not the more limited one first posed in *Cooper*, i.e., whether the City has authority to operate the facility, since under that test a City *ultra vires* operating an unauthorized facility, though it be strictly for profit, would find itself immunized. While under *Cornelisen* and our decision in *Johnson v. City of Atlanta*, it is not *necessary* to find such express authority to operate for revenue, the city ordinances in this case are *sufficient* to take the operation of this facility out of the category of facilities operated primarily as a "place of resort for pleasure and promotion of health of the public." *Cornelisen*, supra, p. 419.

The trial court erred in granting summary judgment to the City on the apparent basis that the charter itself did not expressly grant authority to operate the facility primarily as a source of revenue, this not being the sole determinative standard. There still remained the question of whether the facility was designed to "maximize revenues" or to be operated primarily for the general good of the public.

2. Appellant contends the trial court erred in sustaining the City's objections to the affidavit of a former Albany City Commissioner submitted in opposition to the City's motion. In this affidavit, Bert Jones stated, upon his personal knowledge, that he was a commissioner during the time that operation and function of the Albany Civic Center was considered by the commission. He stated: "The Albany Civic Center was a commercial enterprise by the City of Albany. Although the Civic Center did not turn a profit during my tenure as a commissioner, [its] intended purpose was to generate revenues for the general use of the City of Albany to eliminate operational costs and hopefully reduce its debt service. The City also hoped that it would profit through an increased amount of commercial activity for Albany merchants and business from patrons of the Civic Center. . . . The Albany Civic Center was always considered as a potential source of revenue for the City of Albany."

Clearly the form of much of what this affiant says is objectionable, being an attempt to express a legislative will and intent best left to the statement of that will and proper interpretation of it (*Southern R. Co. v. A. O. Smith Corp.*, 134 Ga. App. 219 (213 SE2d 903)); but the subject matter is not so sanctified or beyond scrutiny that the affiant may not state what his own view and opinion in the proceed-

ings were, and what he intended to achieve as a fact, so long as in doing so, he does not attempt to contravene or impeach the legislation. *Summer v. Allison,* 127 Ga. App. 217 (1) (c) (193 SE2d 177). The trial court did not err in sustaining the objections to the affidavit as it was stated.

*Judgment affirmed in part and reversed in part. Deen, P. J., and Pope, J., concur.*

DECIDED SEPTEMBER 18, 1987 —
REHEARING DENIED NOVEMBER 4, 1987 — 

*Hilliard P. Burt, Terry J. Marlowe,* for appellant.
*Mark A. Gonnerman, Dawn G. Benson,* for appellee.