**Robert B. STRYKER, Plaintiff,**

v.

**CITY OF ATLANTA, Defendant.**

**Civ. A. No. 1:88–CV–0100–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 5, 1990.

Thomas Broughton Branch, III, Caroline C. Kresky, Joan Dreskin, Wildman, Harrold, Allen, Dixon & Branch, Atlanta, Ga., for plaintiff.

James Stephens Strawinski, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., for defendant.

### ORDER

FORRESTER, District Judge.

This action in negligence for the failure to maintain secure premises is before the court on defendant City of Atlanta's motion for summary judgment, or in the alternative, motion for partial summary judgment pursuant to Fed.R.Civ.P. 56.

### I. STATEMENT OF FACTS

On December 28, 1986, plaintiff Robert B. Stryker (plaintiff) flew into the William B. Hartsfield Atlanta International Airport (airport) from Florida on a plane ultimately destined for Maryland. Plaintiff Stryker's connecting flight to Maryland was delayed by inclement weather conditions. Plaintiff, along with two other young women he had met during his flight from Florida, decided to have a cocktail while they awaited more current flight information from the airlines. While plaintiff and his companions conversed in a neighboring lounge, representatives from Eastern Airlines announced that all connecting flights had been cancelled and that hotel vouchers would be available to interested passengers.

Plaintiff and his two companions left the lounge to pick up their vouchers and returned only to find that the lounge had closed for the evening. Thereupon plaintiff's party traveled to a second cocktail lounge in Concourse B of the airport terminal. While there, plaintiff and his compan-

ions shared another round of drinks and discussed their pending plans for the evening. It was in the second lounge that plaintiff first observed the Johnson brothers. According to plaintiff, his attention was drawn to the Johnson brothers because of an argument the two men were having with a woman in the lounge.

After plaintiff's party left the lounge, they rode the moving sidewalk from Concourse B to the main terminal complex. The Johnson brothers followed close behind, often directing loud, unseemly comments towards plaintiff and his two female companions. Without responding to the remarks, plaintiff's party exited the moving sidewalk and proceeded into the Delta baggage area to call the hotel for a courtesy van.

While plaintiff was on the courtesy line, Steve Johnson grabbed the breast of one of plaintiff's companions. Highly upset, the woman began yelling at the Johnson brothers. Plaintiff hung up the telephone and requested that the Johnson brothers leave him and the women alone. Plaintiff and his companions quickly left the courtesy phones and proceeded back through the Delta baggage claim area into the hallway leading to the west curb ground transportation area. The Johnson brothers continued to hurl insults at plaintiff and his companions as they followed them outside to the ground transportation area. According to plaintiff, no police or airport security were anywhere to be found during the entire episode.

Once outside the west curb doors, the Johnson brothers continued verbally harassing plaintiff and the two women. While plaintiff's party contemplated haling a taxicab, Anthony Johnson physically pushed plaintiff several times, ultimately knocking him off the sidewalk. Plaintiff continued to look for assistance and finding none began to yell for help. While Anthony Johnson shoved, punched and kicked plaintiff to the ground, his brother Steve held would-be rescuers at bay with a pock-et knife. One taxicab driver did, however, call police to the scene of the assault. The Johnson brothers were apprehended and subsequently charged and convicted of aggravated assault and battery.

During his altercation with the Johnson brothers, plaintiff was kicked in the testicles. Plaintiff's injury required two operations: one to remove his right testicle and another to replace the right testicle with an artificial transplant.

On January 19, 1988, plaintiff filed suit against the City of Atlanta, the Atlanta Air Lines Terminal Corporation and ARC Security, Inc. A settlement was reached between plaintiff and defendants ARC Security and Atlanta Air Lines Terminal Corporation. Thus, only defendant City of Atlanta remains a party to this action.

It is undisputed that the City of Atlanta is the owner and operator of the airport. However, the parties' characterization of the city's operation of the airport differs greatly. Plaintiff contends that the City of Atlanta uses the airport to generate revenues, while defendant asserts that the airport is operated primarily to benefit the public rather than for profit. In support of this contention, defendant shows this court that the airport does not transfer any of its operating profits into the general funds of the City of Atlanta.

It is undisputed that defendant City of Atlanta has leased nearly 100 percent of the terminal building area to contracting airlines and outside concessions. The lease agreement requires that liability insurance be provided to cover any possible liability "arising out of the maintenance, use and occupancy" of the terminal building area. *Id.* at ¶ 9.10. It is undisputed that the City of Atlanta is listed as a named insured on two comprehensive premises liability policies.[1] Policy 8198 limits liability to $25 million while Policy 8105 has limits of liability of $150 million.

It is plaintiff's contention that the City of Atlanta, as owner and operator of the airport, had a "duty to provide for the safety

---

**1.** The policy numbers are: (1) DA000–2106/AP146–8198 (Policy 8198); and (2) DA000–2114/AP146–8501 (Policy 8501).

of plaintiff from acts of criminal violence while he was traveling through the airport." Plaintiff's Brief, at p. 2. Plaintiff further contends that defendant City of Atlanta breached this duty by failing to provide the quality and quantity of police services necessary for the adequate protection of the traveling public. Finally, plaintiff contends that since the City operates the airport for profit, it, like any other business entity, is liable for punitive damages. *See id.*

Defendant City of Atlanta contends that it is entitled to summary judgment as a matter of law because plaintiff has no private cause of action against a municipality for negligently providing police services, and no right to punitive or exemplary damages against a municipality exists under Georgia law.

## II. CONCLUSIONS OF LAW

### A. *Liability*

██ Central to the disposition of this case is the issue of whether the defendant City of Atlanta operates the airport as a governmental function, for the public benefit, or as a ministerial function, in order to generate revenues. Resolution of this issue will determine whether defendant City of Atlanta must forfeit its governmental immunity and become potentially liable to plaintiff for punitive damages for its alleged negligent provision of adequate police services.

In Georgia it is settled law that "where the [G]overnment engages in the operation of a business or business enterprise, it should, as a general rule, forfeit its traditional immunity from liability, and be held to do business on business terms." *Southern Airways Co. v. DeKalb Co.*, 102 Ga. App. 850, 854, 118 S.E.2d 234 (1960); *Cleghorn v. City of Albany*, 184 Ga.App. 732, 735, 362 S.E.2d 386 (1987). In the case at bar, defendant moves for summary judgment on the ground that the airport in question was operated primarily for the public benefit, a government function for which the City of Atlanta is immune from

liability. *See* Defendant's Brief, at pp. 9–12. Plaintiff counters that the city's governmental immunity is lost because said airport is operated primarily as a source of revenues. *See* Plaintiff's Brief, at pp. 16–18.

In deciding the question of whether defendant City of Atlanta is engaged in a governmental or ministerial function, the profitability of the airport is not dispositive. *See Cleghorn*, 184 Ga.App. at 735, 362 S.E.2d 386. This court is instructed to consider the essential character of the airport and determine "whether the facility was designed to 'maximize revenues' or to be operated primarily for the general good of the public." *Id.* at 736, 362 S.E.2d 386.

In the present case, it is undisputed that defendant City of Atlanta has leased nearly 100% of the terminal building area to contracting airlines and outside concessions.[2] The existence of such commercial leases has led several Georgia courts to conclude that the municipality in question was engaged in a ministerial and not governmental function. *See, e.g., Taylor v. King*, 104 Ga.App. 589, 592, 122 S.E.2d 265 (1961); *Southern Airways*, 102 Ga.App. at 855, 118 S.E.2d 234; *Caroway v. City of Atlanta*, 85 Ga.App. 792, 795–96, 70 S.E.2d 126 (1952). Underlying each decision was the recognition that such leases necessarily become a source of revenue for the municipality. *See Caroway*, 85 Ga.App. at 794, 70 S.E.2d 126; *Taylor*, 104 Ga.App. at 592, 122 S.E.2d 265 (adopting the logic of *Caroway*); *Southern Airways*, 102 Ga.App. at 854, 118 S.E.2d 234 (same).

In order to avoid the damaging conclusion warranted by the existence of commercial leases, defendant argues that the "revenues generated at the airport could not be construed as profits since none of those revenues are ever allowed to be transferred into the general funds of the City of Atlanta." Defendant's Brief, at p. 11. Defendant's argument misses the mark. As mentioned above, whether the airport turns a "profit" is not the controlling issue.

---

**2.** This court notes that during oral argument on the pending motion for summary judgment, de-

fendant conceded that nearly all of the commercial space has been leased by the City of Atlanta.

What is significant, however, is the fact that defendant's commercial leases produce a steady stream of revenue for the city. Moreover, that these revenues never wind up in the city's coffers is no reason for this court to ignore well-established precedent barring immunity on facts nearly identical to the present case. Accordingly, this court concludes, as a matter of law, that defendant's operation of the subject airport is ministerial and not governmental in nature.

Plaintiff argues that "since the city operates the [a]irport in its ministerial capacity, it like any other private corporation, is liable for punitive or exemplary damages." Plaintiff's Brief, at p. 2. This court disagrees. It is well settled in the law "that absent statutory authority, a municipality cannot be held liable for punitive damages." *City of Columbus v. Myszka,* 246 Ga. 571, 573, 272 S.E.2d 302 (1980).

Plaintiff strongly contends that the *Myszka* case, which involved a municipality acting in a traditional governmental function, does not control the case at bar. Plaintiff, rather, suggests that this court's ruling be guided by the case of *Binns v. Metropolitan Atlanta Rapid Transit Authority,* 168 Ga.App. 261, 262, 308 S.E.2d 674 (1983), which equated MARTA to a municipality for the sake of argument and held that the Authority was subject to punitive damages. In so holding, however, the court of appeals made clear that the punitive damages were not imposed against MARTA as a tortfeasor, but rather in its capacity as a self-insurer under Georgia no-fault law. *See id.* at 261, 308 S.E.2d 674. The *Binns* court further emphasized that "the 'statutory authority' required by

*Myszka* for the imposition of punitive damages exist[ed] as far as MARTA [was] concerned."[3] *Id.* at 261, 308 S.E.2d 674. To the extent that plaintiff relies on the holding in *Binns* to support the imposition of punitive damages in the present case, said reliance is untenable. The statutory authority required for the imposition of punitive damages is fatally absent in this case.[4]

The Supreme Court has observed that "[b]y 1871 ... a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity, but this understanding did not extend to the award of punitive or exemplary damages." *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 259, 101 S.Ct. 2748, 2755–56, 69 L.Ed.2d 616 (1981); *see also Walters v. City of Atlanta,* 803 F.2d 1135, 1148 (11th Cir. 1986). The narrow holding of *Binns* was not intended, as plaintiff suggests, to abrogate a municipality's immunity from punitive damages where said municipality functions in a ministerial capacity. Accordingly, this court concludes that while defendant City of Atlanta may be subject to compensatory damages for its alleged negligent provision of adequate police services, it is immune from punitive damages.

Now turning to the merits of plaintiff's liability claim, the sole issue before this court is whether defendant City of Atlanta, as operator of the airport premises, showed ordinary care in protecting invitees against violent criminal acts of third persons.

■ Having established that defendant City of Atlanta owns and operates the airport as a ministerial and not governmental function, this court concludes that it, like

---

**3.** The statutory authorization for said punitive damages is O.C.G.A. § 33–34–6(c) which provides in relevant part:

   ... in the event that an insurer fails or refuses to pay a person the benefits which the person is entitled to under this chapter within sixty days after the proper proof of loss has been filed, the person may bring an action to recover the benefits; and, if the insurer fails to prove that its failure or refusal to pay the benefits was in good faith, the insurer shall be subject to *punitive damages.*

O.C.G.A. § 33–34–6(c) (emphasis added). As a self-insurer, MARTA was made subject to this

statutory provision by section 22 of the MARTA Act which unequivocally made MARTA liable in tort to the same extent that a private insurance corporation would be.

**4.** In *Binns,* the court only considered the implications of MARTA's status as a self-insurer after it had found the requisite statutory authority for the imposition of punitive damages. Absent statutory authorization for such damages in the present case, this court need not discuss whether defendant City is a self-insurer within the meaning of *Binns.*

any other private business, must keep the premises safe for business invitees. "It is well to observe that where, as in this case, an owner of [airport] property leases it to be used in the conduct of a business, those coming upon the premises in connection with the conduct of the business are invitees of the owner and proprietor alike." *Atlanta Braves v. Leslie,* 190 Ga.App. 49, 50, 378 S.E.2d 133 (1989) (*citing Copper v. Anderson,* 96 Ga.App. 800, 808, 101 S.E.2d 770 (1957)). Under Georgia law defendant City of Atlanta had a duty to exercise ordinary care and diligence to protect plaintiff while he was in the airport from injury either from the unsafe condition of the premises themselves or from acts of criminal violence. *Metropolitan Atlanta Rapid Transit Authority v. Allen,* 188 Ga.App. 902, 374 S.E.2d 761 (1988).

This court finds, as a matter of law, that an action lies against defendant City of Atlanta to the extent that it was negligent in protecting invitees from the violent acts of third persons. However, if the evidence shows only that the city's police officers themselves were negligent in their provision of the agreed-upon security services, then plaintiff's claim is completely barred by the express language of O.C.G.A. § 36–33–3.[5] *See also City of Atlanta v. Frye,* 148 Ga.App. 269, 251 S.E.2d 90 (1978) ("a municipality is not liable for the negligence of its officers in the performance of governmental functions"); *City of Macon v. Powell,* 133 Ga.App. 907, 213 S.E.2d 63 (1975); *Brannan v. City of Brunswick,* 49 Ga.App. 62, 174 S.E. 186 (1934).

Federal regulation requires that the City of Atlanta, as owner and operator of the airport "provide for the safety of persons ... traveling in [airports] against acts of criminal violence." 14 C.F.R. § 107–3(a). Plaintiff contends that defendant City of Atlanta breached its federal statutory and state common law duty to provide for the safety of plaintiff from acts of criminal violence by failing to provide the quality and quantity of police services necessary for the protection of the traveling public.[6] Defendant counters that the city cannot, in any respect, be held liable for the operation of a police department because said operation is a governmental function. Although defendant correctly states the law, it misconstrues plaintiff's complaint as one against the city for negligent policing. Plaintiff, in this case, does not directly challenge the city's operation of its police department. Rather, the gravamen of plaintiff's complaint is that defendant's failure to provide the level of protection necessary to meet the requirements of Federal Aviation Regulations constitutes actionable negligence. In order to survive the city's motion for summary judgment, plaintiff must show by competent evidence that the quality and quantity of police services sought were inadequate, as determined by state law, informed by federal regulation. This court concludes that plaintiff has met his initial burden in this regard.

Plaintiff has gone beyond the pleadings and produced competent evidence from

---

5. O.C.G.A. provides "a municipal corporation shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law."

6. Although the parties have not briefed the issue of whether or not a federal law or regulation can provide the standard of care, this court's research has revealed binding authority holding that they may. In the case of *Lowe v. General Motors Corp,* 624 F.2d 1373, 1379 (5th Cir.1980), the Fifth Circuit held that violations of federal laws or regulations can provide evidence of both negligence and negligence per se. In so holding the *Lowe* court stated "the mere fact that the law which evidences negligence is federal while the negligence action itself is brought under state common law does not mean that the

state law claim metamorphoses into a private right of action under federal regulatory law." *Id.* In the present case, the federal aviation regulation in question imposes upon defendant City of Atlanta no new duty nor does it relieve it of any preexisting duty. Now, as before the federal regulation was enacted, the city is obligated under state law to protect the travelling public from violent criminal acts. The legal duty is the same. Therefore, this court concludes that allowing federal aviation regulations to act as "guides for the determination of standards of care" in no way expands the potential liability of defendant City of Atlanta. *National Marine Service, Inc. v. Gulf Oil Co.,* 433 F.Supp. 913, 919 (E.D.La.1977), *aff'd* 608 F.2d 522 (5th Cir.1979). The requirements seem coterminous.

which a jury might conclude that at the time of the incident in suit, the quality and quantity of police services was well below that which was necessary adequately to protect the traveling public from violent criminal acts. At the request of the City's Chief of Police, Morris Redding, Deputy Chief of Police W.J. Taylor thoroughly reviewed the adequacy of the city's police manpower allocations for 1986 in a confidential memorandum dated August 22, 1986. Mr. Taylor's candid assessment states in relevant part:

> That the number of Officers shown as required for the Airport is the contract level, not the requirement. Hartsfield underwent considerable expansion without a commensurate increase in the allocation for police. Our estimates indicate that one hundred and three (103) officers, fifteen (15) over the current level, are needed.... As is readily apparent [from the statistics presented herein], the division is nowhere near its required level of staffing. This can mean only one thing, *our ability to supply required services must suffer.* Presently, all of the programs are operating short, and some have been abandoned in order to concentrate resources on the basic patrol function. *This hinders our ability to perform our part of the Bureau's mission,* since each program is considered vital to that mission.

Plaintiff's Motion to Compel and For Sanctions, Exhibit 1, at pp. 3–4 (emphasis added). The opinion in this memorandum is sufficient to create a question of fact on the issue of whether defendant City of Atlanta was negligent in protecting patrons from the criminal acts of third persons. Plaintiff's expert also testified that the city's allocation and deployment of police services at the airport was inadequate and incapable of deterring acts of criminal violence. *See* Edwards Depo., at pp. 111–13.

Viewing the evidence in a light most favorable to plaintiff, this court concludes that a genuine issue of material fact exists as to whether defendant City of Atlanta breached its duty to provide for the safety of plaintiff from acts of criminal violence while he was traveling through the airport.

### B. *Availability of Insurance Coverage*

Hoping that this court might agree with its position that the operation of an airline terminal is a governmental function, defendant contends further that the city does not have insurance coverage for the claims presented in this case and, therefore, has not waived its immunity. For the reasons outlined below, defendant's contention would be rejected by this court, if it were necessary to reach it. The issue seems now moot in view of the determination that the city here is acting in a ministerial capacity.

The underlying lease agreement requires that liability insurance be provided to cover any possible liability "arising out of the maintenance, use and occupancy" of the terminal building area. *See* CPTC Lease, at ¶ 9.10. It is undisputed that the City of Atlanta is listed as the named insured on two comprehensive premises liability policies. Policy Number 8198 provides coverage for legal liability arising out of the city's operations at "the Joint Leased Premises Midfield Terminal Complex at the William B. Hartsfield Atlanta International Airport." Defendant's Brief, at Exhibit 1. The policy itself, however, does not define the term "joint leased premises." Defendant, therefore, refers this court's attention to the underlying lease which defines the term to include all premises "located within the ... terminal buildings." *See* CPTC Lease, at ¶ 4.3.

It is defendant's contention that Policy No. 8198 only provides coverage for liability within the main terminal complex and, inasmuch as the underlying tort occurred outside the main terminal area, plaintiff is without coverage. Defendant's argument is factually and legally flawed.

■ First, inasmuch as the CPTC Lease is not a part of the insurance contract issuing Policy 8198, the narrow definition of the term "joint leased premises" suggested by defendant to limit coverage to areas located within the terminal is not binding upon this court. *See* O.C.G.A.

§ 33–24–1 (defining insurance policy to include only the written contract or agreement effectuating insurance); *see also Georgia International Life Ins. Co. v. King*, 120 Ga.App. 682, 683, 172 S.E.2d 167 (1969) (precluding the use of separate statements, papers or documents to void a policy or be used in defense of a claim on the policy). In the case of *Garmany v. Mission Ins. Co.*, 785 F.2d 941 (11th Cir.1986), the Eleventh Circuit reviewed the general principles of insurance contract construction under Georgia law and observed:

> Ambiguities in an insurance contract must be construed strongly against the carrier, and an insurance policy must be construed to provide coverage unless the contrary clearly appears.... As a matter of public policy, it is generally recognized that insurance policies are to be liberally construed for the protections not only of the insured ..., but also the innocent plaintiff who was injured.

*Id.* at 945. The court further notes that insurance policies, being contracts, are subject to ordinary rules of construction. *See American Cas. Co. v. Crain–Daly Volkswagen*, 129 Ga.App. 576, 579, 200 S.E.2d 281 (1973). Contracts under Georgia law, even when ambiguous, are to be construed by the court and no jury question is presented unless an ambiguity remains after application of applicable rules of construction. *See Travelers Ins. Co. v. Blakey*, 255 Ga. 699, 700, 342 S.E.2d 308 (1986).

In the instant case, the issue is the construction to be given the undefined term "joint leased premises." In attempting to ascertain the intentions of the parties, this court notes that the test under Georgia law is not what defendant says the insurer intended its words to mean, but what a reasonable person in the position of the plaintiff would understand them to mean. *See Nationwide Mutual Fire Ins. Co. v. Collins*, 136 Ga.App. 671, 676, 222 S.E.2d 828 (1975). Relying on definitions found in the underlying lease, defendant suggests a narrow construction of the term "joint leased premises" which would deny plaintiff coverage under this particular policy. This court concludes, however, that the lit-

eral language of Policy 8198 does not mandate the narrow construction that plaintiff suggests. "Premises" as that term is understood in normal usage, speaks of property. *See Webster's Third New International Dictionary* (1981); *see also Black's Law Dictionary* (5th Ed.1979) (defining premises as land and its appurtenances). Therefore, since plaintiff was undeniably on airport property, defendant will not be heard to argue that plaintiff stepped out of coverage under this particular policy once he stepped outside of the terminal building. That the construction urged by defendant would result in a denial of coverage is significant. This court is instructed to construe ambiguous contract terms to provide coverage unless the contrary clearly appears.

As a purely factual matter, this court disagrees with defendant's assertion that the underlying incident "clearly" occurred outside the main terminal complex. It is undisputed that the assault and battery culminated on the ground transportation area just outside the west curb doors. Nevertheless, it cannot be gainsaid that the "incident" underlying this suit began, as plaintiff argues, "deep within the bowels of the terminal building and continued throughout large portions of the terminal, all of which were within the building even under defendant's definition." Plaintiff's Brief, at p. 23.

In view of the reasonable construction that can be given the term "premises," this court finds no ambiguity and concludes that the terms of Policy 8198 provide coverage for the personal injury claims presented in this case.

■ As concerning Policy 8501, which contains a $500,000 deductible and admittedly provides $150,000,000 of liability coverage to third parties, defendant contends that "the city is entitled to sovereign immunity for the first $500,000 of any judgment and for any amount in excess of $150,000,-000." Defendant's Brief, at p. 16.

In the case of *Martin v. Georgia Dept. of Public Safety*, 257 Ga. 300, 357 S.E.2d 569 (1987), the Georgia Supreme Court was

"called upon to reexamine the status of sovereign immunity in this state after the enactment of the 1983 Constitution, which provides for the waiver of sovereign immunity for the state or its agencies where liability insurance has been purchased." *Id.* The Supreme Court concluded that the 1983 Constitution unequivocally expressed the citizens' desire that individuals harmed by actions of the state be compensated if insurance is available. In so concluding, the *Martin* court observed:

> Of course, the state is not required to provide insurance protection either through purchasing coverage from a private carrier or through the establishment of a self insurance fund. But if it does either, the waiver operates and the proceeds of a self insurance fund would stand on the same footing as those available from a policy issued by a private carrier.

*Id.* at 301, 357 S.E.2d 569.

Defendant cites *Martin* for the proposition that a city only waives its immunity to the extent that there is actually money available to pay the claim. *See* Defendant's Brief, at p. 17. And since the city does not maintain any fund, save the general funds of the City of Atlanta, from which to pay the deductible, defendant argues that the city is entitled to sovereign immunity for the first $500,000 of any judgment. Defendant's argument is fatally based upon an over-broad reading of *Martin*.

*Martin* did not make the sovereign's waiver of its immunity dependent upon the availability of funds to pay the claim. *Martin* did, however, relate the sovereign's waiver of its immunity to the purchase of liability insurance from a private carrier. *See Martin*, 257 Ga. at 301, 357 S.E.2d 569. And, "if such insurance is in effect, contracting to pay for damages arising from the conduct for which the claim is asserted, then that contract is enforceable, and the claim is to be paid to the limits of the contract, sovereign immunity notwithstanding." *Id.* at 303, n. 2, 357 S.E.2d 569. Since Policy 8105 covers the claims asserted in this lawsuit, *see* Defendant's Brief, at pp. 16–17, this court concludes that the city has waived its sovereign immunity to the extent of the $150,000,000 self-insured amount. *Id.; see also* O.C.G.A. § 36–33–1 (allowing for waiver of immunity by purchase of liability insurance).

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED.

SO ORDERED.