Harold Dwight DOUGLAS et al.,
Plaintiffs-Appellees,

v.

Hubert W. SMITH, Defendant,

Amoco Oil Company and Tri-County Gas Company of Pearson, Inc.,
Defendants-Appellants.

No. 76-2537.

United States Court of Appeals,
Fifth Circuit.

Aug. 28, 1978.

Rehearing Denied Oct. 18, 1978.

Wilson G. Pedrick, Waycross, Ga., for Amoco.

Seymour S. Owens, Ken R. Hilyer, Tifton, Ga., for Tri-County.

Lee R. Williams, Douglas, Ga., Dubignion Douglas, Dublin, Ga., for plaintiffs-appellees.

Before GOLDBERG, GODBOLD and SIMPSON, Circuit Judges.

GODBOLD, Circuit Judge:

These are Georgia diversity cases consolidated for trial.

Plaintiff sued for himself and his minor child for injuries suffered by the two of them in an LP gas explosion in Georgia. The defendants are Smith, owner of the premises, and Amoco and Tri-County, suppliers of LP gas. A jury returned general verdicts against all defendants, for $25,000 in the father's case, $90,000 in the child's case. Motions of Amoco and Tri-County for directed verdicts and judgments n. o. v. were overruled and they appeal. Smith has not appealed.

We conclude that Amoco's motion for directed verdict should have been granted on all claims, so it is entitled to a reversal with direction that judgment be entered in its favor. Tri-County's motion for directed verdict should have been granted on several claims against it but was properly denied as to other claims. However, because the verdict was general we cannot determine the

basis for it as against Tri-County, so we must reverse and remand for further proceedings on the claims against Tri-County that survived its motion for directed verdict.

## I. The facts

Smith owned a duplex apartment building located outside the small town of Douglas, Georgia. The apartments were heated by gas space heaters, each of which, until shortly before the explosion, was supplied with LP gas from a 500-gallon underground tank located some distance from the building. Amoco and Tri-County delivered to the tank LP gas purchased by Smith. A line or lines led from the tank to a meter at each apartment. There was evidence from which the jury could find that Smith rented to his tenants under an arrangement by which each tenant paid Smith for the amount of gas actually consumed in the tenant's apartment, as shown by the meter for the apartment.

In late December 1971 or early January 1972 Smith and his son disconnected a space heater in one of the apartments, moved it across the room, and by means of a separate line run through a window connected it to an LP gas cylinder located just outside the building. There was evidence from which the jury could infer that the tenant of this apartment had not paid Smith for gas which she had consumed from Smith's tank, and that Smith moved the heater to deny her access to his gas and to force her to make her own arrangements for gas to be supplied from the gas cylinder.

There was adequate evidence to support a conclusion that when the Smiths moved the heater they failed to plug the line that had been supplying it. After moving the heater the Smiths turned off the gas supply at the tank and gas ceased to flow from the tank to the duplex.

After the heater was moved the tenant in that apartment vacated, and around January 31 Smith rented the apartment to the plaintiff with the usual arrangement that the tenant would pay Smith for gas consumed. Douglas began to move into the apartment on February 6. He asked Smith to have the gas turned on, and Smith's son activated the 500-gallon tank supply system around midday. Douglas and other adults came to the apartment during the afternoon to bring in furniture and departed. In the early evening Douglas, his 8-year-old son, and others arrived at the apartment, and the child went ahead of the others and turned on the television set. An explosion and fire occurred. Firefighting personnel disengaged the storage tank. Later the unplugged line was discovered. When the tank was turned on again gas flowed through the open line and was emitted into the room.

Before late 1971 Amoco supplied Smith with gas. Amoco made its last delivery, 200 gallons, on November 14. Tri-County delivered 400 gallons on November 30 and 300 gallons December 27. The 500-gallon tank had an effective capacity of 450 gallons.

## II. Negligence

Plaintiff charged negligence by the two gas suppliers as follows: (1) They failed to inspect Smith's premises before delivering gas. (2) They delivered gas to Smith when they knew or should have known he was maintaining unvented appliances. (3) They delivered gas to Smith when they knew or should have known he was engaged in the physical installation of an LP gas system without a license, or was servicing, repairing, adjusting, connecting or disconnecting appliances, piping, tubing or fittings without a license. (4) They delivered gas to Smith when they knew or should have known he was an unlicensed dealer. (5) They delivered gas to Smith when they knew or should have known that he was an uninsured dealer.

■ Amoco should have been granted a directed verdict on all claims because there was insufficient evidence that the gas it delivered was the gas that exploded. For other reasons discussed below both Amoco and Tri-County were entitled to directed verdicts on claims numbered (1), (2) and (3),

above. This leaves for consideration on remand, against only Tri-County, claims numbered (4) and (5).

■ Claim (1), based upon an alleged duty to inspect the premises before making a delivery, is a common law claim. It fails because under Georgia law the supplier has no duty to inspect the premises before making a delivery unless it has control of the appliances or actual knowledge of the defective condition of the premises. *Milligan v. Georgia Power Co.*, 68 Ga.App. 269, 22 S.E.2d 662 (1942); *Davis v. General Gas Corp.*, 106 Ga.App. 317, 321, 126 S.E.2d 820, 823 (1962). There was not substantial evidence that either appellant had such control or knowledge.

The remaining claims were rooted in alleged per se violations of the state fire marshal's regulations relating to LP gas. Georgia controls liquefied petroleum gas through the Liquefied Petroleum Safety Act of Georgia, enacted in 1948. Ga.Stat. Ann. § 73–301 et seq. Section 73–304 authorizes and directs the state fire marshal to promulgate and enforce rules and regulations:

> 73–304 Rules, regulations, etc.; duty to promulgate; contents
>
> The State Fire Marshal shall make, promulgate, adopt and enforce rules and regulations setting forth minimum general standards covering the design, construction, location, installation and operation of equipment for storing, handling, transporting by tank truck, tank trailer, and utilizing liquefied petroleum gases and [specifying the odorization] of said gases and the degree thereof. Said rules and regulations shall be such as are reasonably necessary for the protection of the health, welfare, and safety of the public and persons using such materials, and shall be based upon reasonable substantial conformity with the generally ac-

cepted standards of safety concerning the same subject-matter. (Acts 1949, pp. 1128, 1129.)

The trial court instructed the jury from the Rules and Regulations for Liquefied Petroleum Gases of the Safety Fire Commissioner of Georgia, dated April 1, 1968.[1]

The trial court read to the jury various parts of these regulations and instructed that they were in force at the time of the accident. With respect to violations of the regulations the court charged:

> I charge you that for one to violate a valid regulation of the State of Georgia pertaining to LP gas constitutes negligence as a matter of law, that is negligence in and of itself; so that in determining whether any of these Defendants committed an act of negligence per se, you would merely determine whether or not such Defendant violated any one of these applicable regulations of the State of Georgia dealing with the handling of LP gas.

There was no objection to this instruction and on appeal it is not claimed to be erroneous.

The purpose of the regulations is described in § 120–3–16–.01(2)[2] thereof:

> to prevent the loss of life, injury of persons, and loss or damage to property in storage, handling, use and transportation of liquefied petroleum gases.

Smith had no license of any kind relating to LP gas. The licensing requirements of the regulations appear in § .02:

> 120–3–16–.02 Administration.
>
> (1) General. *It is prohibited for any person to manufacture, distribute, sell, store for sale or transportation, transport by tank truck or tank trailer, Liquefied Petroleum gas or to engage in the Physical Installation of LP Gas Systems or to service, repair, adjust, connect or discon-*

---

1. Ga.Code Ann. § 92A–701 et seq. provides for the state safety fire commissioner, and he is given rule making power under § 92A–703. He appoints a state fire marshal, § 92A–704, and has supervision and control over him, § 92A–702. We, therefore, proceed as the trial court and the parties have done, on the basis that the

rules and regulations before us are those authorized by § 73–304.

2. All sections of the regulations bear the prefix numbers "120–3–16." In subsequent citations we will omit these prefix numbers.

*nect appliances, piping, tubing or fittings thereto, in this State, except by the authority of a written License or Permit issued by the State Fire Marshal therefor in conformance with these Rules and Regulations.*

(2) License Fees and Information Concerning Licensing.

(a) An annual fee for each calendar year or fraction thereof shall be paid to the State Fire Marshal for a license to engage in one or more of the activities prescribed above, as follows:

1. For each location where Liquefied Petroleum Gas is stored for sale or transportation with an aggregate storage capacity at any time of:

    (i) 1000 water gallons capacity or less      $ 25.00

    (ii) More than 1000 water gallons capacity but not more than 5000 water gallons capacity    $ 50.00

    (iii) More than 5000 water gallons capacity      $100.00

2. For activities prescribed in paragraph (1) above where storage of Liquefied Petroleum Gas is not required or maintained, as follows:

    (i) For the transportation of Liquefied Petroleum Gas by tank truck or tank trailer      $100.00

    (ii) For the physical installation, servicing, repairing, adjusting, connecting or disconnecting Liquefied Petroleum Gas Systems or appliances      $ 25.00

---

The trial judge read to the jury § .02(1). He read, from § .03, the definitions section, the pertinent part of the definition of a dealer in liquefied petroleum,

Any person selling or offering to sell any liquefied petroleum gas to the ultimate consumer for domestic use,

and the definition of the ultimate consumer,

The person last purchasing liquefied petroleum gas in its liquid or vapor state for domestic use,

and the definition of installation,

The act of installing apparatus, piping, and tubing, appliances, and equipment necessary for storing and converting liquefied petroleum gas into flame for light, heat, cooling, and power for use by the ultimate consumer.

From the judge's instructions and the evidence before them, the jury could infer that Smith sold, distributed or stored LP gas for sale and that he was a dealer in LP gas. Section .02(1) is in terms of activity rather than status, but it is to be considered together with the definitions of dealer and ultimate consumer. The jury could conclude from the provisions read to it that Smith was required to obtain a license as one selling, distributing or storing gas. The jury could not conclude that Smith had engaged in the physical installation of an LP gas system. Detaching one heater from the system in place and connecting it to a free-standing LP gas cylinder is not the installation of a system. The jury could conclude Smith fell within the "service, . . . connect or disconnect appliances (etc.)" language of § .02(1)[3] because of his

**3.** Sec. .06(1)(g) says that only *an owner* or a person authorized by him can connect or dis-

connect a cylinder or tank containing LP gas. This provision appears to be directed at requir-

activity of disconnecting an appliance and tubing and thus by that reason was required to have a license.

Finally, the jury could find that the heater that was moved was not properly vented, in violation of § .05(1)(a), which requires that all heating appliances installed in any apartment shall be vented to the outside air.

Bearing in mind these possible jury findings, we now turn to claims (2), (3), (4) and (5) against the suppliers.

■ Claim (2), negligent delivery to Smith when appellants knew or should have known he was maintaining unvented appliances, should have gone out on directed verdict. There was no evidence that the unvented heater had any relation to the explosion.

The suppliers' conduct is regulated by § .06, entitled "Standards for Storing and Handling of Liquefied Petroleum Gases." Subsection (1)(b) thereof is titled "Filling Unapproved Dispensing or Storage Tanks Prohibited," and subsection 2 thereof says:

> It is prohibited for any person to introduce LP Gas into a container used for the storage or dispensing of LP Gas for sale or transportation unless the owner or operator has a valid license or permit for such location issued by the State Fire Marshal in accordance with these Rules and Regulations.

■ With respect to claim (3), the first prong—delivery to Smith when appellants knew or should have known he was engaged in physical installation of a system without a license—appellants were entitled to a directed verdict because, as we have pointed out, Smith did not engage in such activity. The second prong of claim (3) alleged delivery with actual or constructive knowledge that Smith was engaged in servicing or disconnecting appliances, tubing (etc.) without a license to do so. But as we

read § .06(1)(b)2, it does not apply to delivery to the tank of an unlicensed serviceman. The titles of the section and the subsection seem to us to be directed at the tanks of one storing or dispensing gas in connection with his activity as one storing, selling or transporting gas. The use of tanks for storage or dispensing is not necessarily or even rationally related to whether one is servicing appliances. The plaintiff does not refer us to any duty of a supplier under Georgia common law not to deliver gas to a person who, without a license, services or disconnects gas heaters. Thus appellants were entitled to a directed verdict on the second prong of claim (3).

Claim (4) charged negligent delivery to Smith when appellants knew or should have known he was an unlicensed dealer. Under *Boeing Co. v. Shipman*[4] standards, there was sufficient evidence to submit to the jury on appellants' actual or constructive knowledge, and the jury could find that delivery with such knowledge was a violation of § .06(1)(b)2, and, under the per se negligence instruction, was negligence. Appellants say that § .06(1)(b)2 is limited to forbidding a dealer to introduce gas into his own location unless he has a permit for the location. This would be a very strained construction. If the person introducing the gas and the "owner or operator" are one and the same person it seems likely that the draftsman, instead of saying "unless the owner or operator has a license or permit for such location," would have said "unless such person has a license or permit for such location."

As to claim (5), the court read to the jury the requirement in the regulations that one engaged in any of the activities described in § .02(1) must as a prerequisite to obtaining a license furnish the state fire marshal evidence of insurance in force with coverages of $25,000 products property coverage and $25,000 products liability. Smith testified

---

ing that the cylinder or tank be left in safe condition when turned off. We cannot read it as authorizing, as a matter of law, owner Smith to perform without a license the operation of disconnecting the heater from the tank line and

reconnecting it to an independent line to the cylinder.

4. *Boeing Co. v. Shipman,* 389 F.2d 507 (CA5, 1968).

that he had no insurance. The jury could infer that delivery by appellants to an unlicensed dealer having no insurance was negligence.

Appellants contend, with respect to claims (4) and (5), that plaintiffs were required to prove, and failed to prove, that they had actual knowledge that Smith had no license.[5] We think that § .06(1)(b)2 does not require actual knowledge but is an absolute prohibition against delivery to one without a license. Although ordinarily a violation is excused if the defendant neither knew nor should have known of the occasion for compliance, Restatement (Second) Torts § 288A, constructive knowledge is sufficient for negligence to be implied from the violation of the regulation. In this case the jury could have found that, as plaintiffs alleged, appellants should have known Smith was an unlicensed and uninsured dealer.

### III. Proximate causation.

Amoco was entitled to a directed verdict on all claims against it based on failure to prove proximate cause. The explosion occurred February 7, 1972. Amoco's last delivery, 200 gallons, had been made almost three months before, on November 14. In the interim Tri-County had delivered 400 gallons on November 30 and 300 gallons on December 27, a total by Tri-County of 700 gallons in a tank that held 450 gallons. Plaintiffs offered no evidence tending to prove that any of the Amoco gas remained in the tank on February 7. On argument of Amoco's motion for a directed verdict, counsel for plaintiffs suggested that a jury issue was created because there "could have been" some of Amoco's gas remaining in the tank and that it was up to Amoco to prove that it did not have gas remaining in the tank. These arguments miss the mark. The burden was on plaintiffs to show causal connection between Amoco's delivery to Smith and the explosion. There was no evidence as to how much gas, if any, was already in the tank on November 30 when Tri-County made its first delivery, no expert testimony that the gas from the deliveries would mix, and no expert testimony that the first gas in the tank would be the last gas out of the tank.

Because there was not evidence on which the jury could find that Amoco's gas contributed to the explosion, Amoco was also entitled to a directed verdict on the claims arising from Smith's failure to have insurance. Without evidence that Amoco contributed to the explosion Amoco could have no responsibility for injury to plaintiffs from the absence of insurance.

As to Tri-County, there was sufficient evidence to show that the gas it supplied was the gas that exploded. Since it made the last delivery, 300 gallons on December 27, and had made the next to last, 400 gallons on November 30, and the system was turned off at the tank on January 7, the jury could infer that the gas which was the means of explosion had been put in the tank by Tri-County.

Tri-County makes a strong argument that it was entitled on proximate cause grounds to a directed verdict on all claims springing from Smith's violations of regulations on the ground that the sole efficient cause of plaintiffs' injuries was the intervening acts of Smith, and Smith's lack of a license is not a proximate cause, if a cause at all. We need discuss this with respect to only the remaining viable claims against Tri-County, negligence in delivering to a seller of gas having neither license nor insurance.

The breaches of duty alleged against appellants concern negligent delivery. In considering the relation between that negligence and injury to plaintiffs we must examine the regulatory scheme and the place in this scheme of a seller of gas. Section 73–304 of the statute requires promulgation of regulations "reasonably necessary for the protection of the health, welfare and safety of the public and persons using such materi-

---

5. On all claims springing from Smith's violations of the regulations plaintiffs alleged that appellants "knew or should have known."

als." The regulations, § .01(2), state their purpose is "to prevent the loss of life, injury to persons . . . in storage, handling, use and transportation of liquefied petroleum gases." Section .06(1)(b)2 implements these policies by prohibiting the introduction of gas into a tank unless the owner or operator has a license for that location. The regulations contain no standards of experience, skill or training for a license applicant. But they do implement in other ways the overriding purposes of safety for the public at large and for the user, with respect to a tank and a location as described in § .06(1)(b)2. Where a storage tank is less than 2,000 gallons a sketch or plan containing sufficient detail must be submitted to and approved by the fire marshal before the installation is started. Section .02(4)(b). Electrical circuits may not be grounded to any LP gas system. Section .04(4). Standards are imposed for testing and repairing containers, § .06(1)(f); for piping, tubing and regulators, § .06(1)(h); for foundations, § .06(1)(i); for fencing, § .06(1)(j). As a prerequisite to a license the seller must maintain insurance. § .02(3)(a). Anyone violating any regulation is guilty of a misdemeanor. § .04(3).

■ The distributor impacts on this pervasive regulatory scheme directed at the seller and the seller's location by his delivery to the seller, and he is forbidden to deliver to a seller and a location that have not been brought within the pervasive scheme. If a prohibited delivery is made by a distributor and the gas so delivered explodes at the location of the unlicensed seller and through improper handling by the unlicensed seller, we think the delivery can be a proximate cause of the resulting injury under Georgia law even if the precise impropriety committed by the unlicensed seller is not itself specifically covered by the regulation.

■ Georgia law requires that the injury be the natural and probable consequence of the negligence. The injury may be contingent upon other circumstances to some extent, but if contingent circumstances preponderate largely in causing the injury, damages are too remote to be recovered. Ga.Code Ann. §§ 105–2007 to –2009; *e. g., Medlin v. Bickford,* 106 Ga.App. 859, 128 S.E.2d 531 (1962). Although ordinarily an intervening cause breaks the chain of causation, a defendant may still be liable if the probable consequences could have been reasonably anticipated.

In this case the gas explosion and consequent harm to plaintiff and his son were the natural and probable consequences of the delivery of gas to an unlicensed dealer. Although the precise manner in which the injury occurred could not have been predicted, there was sufficient likelihood of the occurrence of harm in some manner. Smith's negligence is not an intervening cause that breaks the chain of causation because Tri-County could have reasonably anticipated that an unlicensed dealer might negligently handle LP gas.

■ Tri-County's negligent delivery of gas to an uninsured dealer is the proximate cause of a different type of harm: the negligence contravenes the statutory policy of providing compensation for victims of LP gas accidents. It is a natural and probable consequence of delivery of gas to an uninsured dealer that, if an accident occurs, the dealer will be unable to compensate the victims of the accident. Although it could not have predicted the nature of the accident, Tri-County could have reasonably anticipated that the victims might go uncompensated by the dealer. Its negligence thus is a proximate cause of that particular harm. To the extent the victims are uncompensated by other parties and would have been compensated had the dealer been insured, Tri-County may be liable.

### IV. Other issues.

The argument that appellants were entitled to a directed verdict on all claims because as a matter of law plaintiff and his minor child were guilty of contributory negligence or assumption of risk is meritless.

Tri-County argues that it had only a duty of ordinary care and not of extraordinary

care. Its brief does not tell us how this was raised at trial, and we do not find in the record any objection to the jury instruction given on highest degree of care.

The causes are REVERSED and REMANDED with directions for entry of judgment in favor of Amoco and, with respect to Tri-County, for further proceedings not inconsistent with this opinion.

Reversed and Remanded.