Oscar **STUCKEY**, Jr., Plaintiff–Appellee, Cross–Appellant,

v.

**NORTHERN PROPANE GAS CO.**, a corporation; **Buckeye Gas Products Co.**, a corporation, Defendants,

**Dixie Pipeline Company**, a corporation, and **Ferrell L.P.**, Defendants–Appellants, Cross–Appellees.

No. 88–8274.

United States Court of Appeals, Eleventh Circuit.

June 13, 1989.

---

W. Pitts Carr, Eric F. Huber, Atlanta, Ga., for Dixie Pipeline Co.

David R. Schlee, Kansas City, Mo., for Ferrell L.P.

James C. Wirken, Wirken & King, Kansas City, Mo., James W. Hurt, Hurt, Pfeiffer & Hyman, Cordele, Ga., and Robert B. Langstaff, Langstaff & Plowden, Albany, Ga., for plaintiff-appellee, cross-appellant.

Before JOHNSON and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This case arises from a jury verdict finding Dixie Pipeline Co. ("Dixie") and Ferrell L.P. ("Ferrell") liable under Georgia law for injuries sustained by the plaintiff in a propane gas explosion caused by the defendants' negligence. We affirm in part, reverse in part, and remand for a new trial against Dixie.

## I. FACTS

In June 1984, Oscar Stuckey was severely burned in the explosion of propane gas which had leaked into an empty house owned by his parents. Stuckey did not smell any propane when he walked through the house prior to the explosion, and thus was not aware of its presence when he used his lighter, triggering the explosion. In its natural state, propane is an odorless gas. Ethyl mercaptan is added to give propane its distinctive smell.

Dixie supplied propane to Northern Propane Gas Co. ("Northern") who sold propane to Stuckey's parents and delivered it to the house. Dixie used state of the art equipment to add ethyl mercaptan to all propane it supplied to Northern during the relevant time period. Northern transported propane supplied by Dixie to its bulk storage facility. Although ethyl mercaptan is a generally accepted and effective odorant, it tends to lose its pungency under certain conditions.[1] The propane industry in general has long been familiar with this phenomenon of "odor fade." The actual knowledge of Dixie and Northern was disputed at trial; however, it was undisputed that neither warned Stuckey about the potential for ethyl mercaptan's odor to fade.

Stuckey brought suit against Northern, Buckeye Gas Products, and Ferrell (the surviving corporation after the mergers of Northern and Buckeye, and Buckeye and Ferrell). Stuckey also sued Dixie, who was Northern's propane supplier at the time of the accident. The district court granted summary judgment to defendants on Stuckey's strict liability claims, and the case proceeded to trial primarily on the theory of defendants' negligent failure to warn Stuckey about odor fade. At the end of the trial, Dixie moved for a directed verdict which the district court denied. The jury apportioned damages according to fault and assessed $680,000 against Ferrell,[2] and $120,000 against Dixie. Holding that personal injury damages may not be so apportioned under Georgia law, the district court corrected the verdict under Rule 60(a) to reflect an award for Stuckey of $800,000 assessed jointly and severally against both Ferrell and Dixie.

---

1. Its odor may diminish when it comes into contact with rust or when propane gas leaks into a confined area which remains enclosed for an extended period of time.

2. Ferrell, by operation of its merger with Buckeye, succeeded to all liabilities of both Northern and Buckeye.

Dixie appeals the trial court's denial of its motions for summary judgment, directed verdict, and new trial. Ferrell appeals several evidentiary and procedural issues of liability and damages. Stuckey cross-appeals the court's failure to permit the jury to consider awarding punitive damages.

## II. DISCUSSION

### A. Dixie's Motion for Summary Judgment

■ Dixie moved for summary judgment on Stuckey's first amended complaint before Stuckey discovered the propane industry's knowledge of odor fade. The court granted Dixie's motion for summary judgment on Stuckey's strict liability claim but denied Dixie's motion for summary judgment on the negligence count brought by Stuckey. Dixie argues that at the time of its motion, no evidence of the phenomenon of odor fade had yet been adduced; therefore, summary judgment should have been entered. This Court, however, does not review the propriety of orders denying summary judgment motions based on the evidence available when the motion was made. *See Holley v. Northrop Worldwide Aircraft Serv., Inc.*, 835 F.2d 1375, 1378 (11th Cir.1988) ("a party may not rely on the underdeveloped state of facts at the time he moves for summary judgment to undermine a fully-developed set of trial facts which militate against his case"). Even if summary judgment might have been granted at the time the motion was made, we examine the record to see if "by trial the evidence ha[s] been supplemented or changed in some manner favorable to the party who opposed summary judgment." *Id.*

■ In this case, the facts underlying Stuckey's odor fade theory were developed after Dixie moved for summary judgment. Stuckey proceeded to trial and prevailed on the odor fade issue. That set of facts, having been fully developed before trial, is more than sufficient to defeat Dixie's argu-

ment for reversal of the district court's denial of its summary judgment motion.

### B. Dixie's Motion for Directed Verdict

Dixie also appeals the district court's denial of its motion for a directed verdict made after presentation of all the evidence. We may reverse the district court's order only if we find "the evidence, viewed in the light most favorable to the non-moving party, is such that reasonable [jurors] could not arrive at a contrary verdict." *Chouinard v. Chouinard*, 568 F.2d 430, 433 (5th Cir.1978).

#### 1. *Douglas*

Dixie argues that the district court erred in denying its motion for a directed verdict, because Stuckey did not show that Dixie supplied Northern the gas which caused the explosion. Dixie was not Northern's sole supplier, although most of Northern's gas at the relevant time probably originated with Dixie. Northern stored gas it received from all sources in the same tanks.

■ In *Douglas v. Smith*, 578 F.2d 1169 (5th Cir.1978), this Court granted a directed verdict to Amoco in a propane explosion case where no evidence indicated that Amoco propane remained in a residential tank which exploded and injured the plaintiff. This Court held that there was no "evidence on which the jury could find that Amoco's gas *contributed* to the explosion." *Id.* at 1175 (emphasis added). Although the burden is on Stuckey to prove causation, Dixie would interpret *Douglas* to require that Stuckey prove *all* the gas in his parents' propane tank came from Dixie. Under *Douglas*, however, Stuckey must show only that gas supplied by Dixie contributed to his injuries. The unrebutted testimony of Rollins, although speculative at times, provided sufficient evidence for a reasonable jury to conclude that gas from Dixie contributed to Stuckey's injuries.[3] In fact, the jury could have reasonably con-

---

**3.** Rollins, Northern's manager of fuel oil acquisitions, testified that LP gas at the Stuckey house most likely came from Dixie. He stated that due to a cold winter, Northern had acquired gas from non-Dixie sources in December and January of 1983–84, but that by April 1984, when the last shipment was made to the Stuckey house, Northern's gas was once again coming almost exclusively from Dixie.

cluded that most of the gas at the Stuckey household originated from Dixie. This evidence satisfies *Douglas* and is sufficient to defeat Dixie's motion for a directed verdict on the ground that Stuckey failed to prove causation.

### 2. *Actual Knowledge of Intermediary*

■ Dixie claims that Northern's actual knowledge of the phenomenon of odor fade satisfied its duty to warn Stuckey. This assertion that Northern was a "learned intermediary" is Dixie's primary argument on appeal. Dixie's duty to warn is governed by the Restatement (Second) of Torts § 388 (1965), as adopted in *Beam v. Omark Ind., Inc.*, 143 Ga.App. 142, 237 S.E.2d 607, 611 (1977).[4] *See also Rhodes v. Interstate Battery System of Amer., Inc.*, 722 F.2d 1517, 1519 (11th Cir.1984) (under Georgia law a "supplier is under a duty to inform potential users of the product of any facts making it dangerous"). Under the literal terms of Section 388, Dixie had a duty to warn Stuckey. Dixie knew of the odor fade phenomenon; Stuckey did not; and Dixie failed to warn Stuckey. Dixie argues that it discharged or satisfied this duty because it supplied the LP gas to an intermediate retailer with actual knowledge of the phenomenon of odor fade. *See Eyster v. Borg–Warner Corp.*, 131 Ga.App. 702, 206 S.E.2d 668, 671 (1974) (presence of intermediary with knowledge obviated duty of manufacturer to warn ultimate consumer).

■ Comment n to Section 388 governs the parameters of Dixie's duty to warn Stuckey given the intermediary position of Northern. Comment n addresses when a supplier's duty to warn an ultimate consumer can be discharged by a warning given to an intermediary party like Northern. Because it is undisputed that Dixie did not in fact warn Northern, Dixie's reliance on Comment n is predicated on the presumption that Northern had actual knowledge of the odor fade phenomenon. Stuckey argues that Comment n applies only to suppliers who actually warn the intermediary. In other words, in order to rely on Comment n, Dixie would have had to have warned Northern even if Northern actually knew of odor fade. We cannot accept this proposition. Comment n's analysis of a supplier's duty to warn a consumer does not turn on whether a warning was actually given to an intermediary, but on whether the intermediary's knowledge was sufficient to protect the ultimate consumer. *See Eyster*, 206 S.E.2d at 671 (manufacturer who did not warn intermediary had no duty to warn ultimate consumer when intermediary should have known information).

Comment n provides a test that balances several factors: the burden of requiring a warning; the likelihood that the intermediary will provide a warning; the likely efficacy of such a warning; the degree of danger posed by the absence of such a warning; and the nature of the potential harm. *See* Comment n at 310 ("Where the danger involved in the ignorant use of [a product] is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier be required to adopt [warnings]"). Dixie argues that balancing these factors leads to the inevitable conclusion that it satisfied its duty to warn Stuckey.

---

**4. Chattel Known to be Dangerous for Intended Use**

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

The scarcity of Georgia cases on point enhances this Court's need to rely on Section 388 and its comments. Since Georgia has "adopted" Section 388, we predict that the Supreme Court of Georgia would also utilize its accompanying comments in interpreting the law of Georgia.

We hold that Northern's actual knowledge of odor fade is a condition precedent to the application of the factors discussed above. The evidence on the question of Northern's actual knowledge was subject to more than one interpretation. Although Stuckey had no problem proving that the propane gas industry generally knew of the odor fade phenomenon, the link between that body of knowledge and Northern was more difficult to demonstrate. Various publications available to the industry explained odor fade. The National Liquified Petroleum Gas Association ("NLPGA") clearly had knowledge; however, evidence concerning the participation by Northern in NLPGA meetings where odor fade was discussed was unclear and sometimes contradictory. Construing the evidence most favorably to Stuckey for the purposes of Dixie's motion, we find a reasonable jury could have found that Northern did not have actual knowledge of odor fade.[5] We affirm the district court's refusal to grant Dixie's directed verdict motion.

### 3. *Stiltjes*

■ Dixie also argues that it was entitled to a directed verdict under the logic of *Stiltjes v. Ridco Exterminating Co.*, 178 Ga.App. 438, 343 S.E.2d 715, *aff'd* 256 Ga. 255, 347 S.E.2d 568 (1986). *Stiltjes* provides an exception to the rule discussed above. In Georgia, if an intermediary is charged by law with knowledge that a supplier would otherwise have a duty to communicate to the eventual consumer, the supplier need not communicate that knowledge to the consumer. In such a situation, an irrebuttable presumption arises that the intermediary has knowledge. 343 S.E.2d at 719.

In *Stiltjes,* a pesticide manufacturer supplied a commercial applicator with a pesticide that caused an adverse reaction in the plaintiff, an apartment dweller. The court held that the pesticide manufacturer had no duty to warn the plaintiff because the

manufacturer was entitled to rely on the laws charging commercial applicators with knowledge of pesticide toxicity and safe methods of application. Dixie argues that LP gas retailers are similarly charged by law with knowledge of the dangers of LP gas. If LP gas retailers are regulated to the same degree as pesticide applicators, then Dixie would have been entitled to the irrebuttable presumption that Northern had knowledge of odor fade.

A comparison of the statutory framework regulating the pesticide application industry and the LP gas retailing industry reveals that Dixie's argument has no basis in fact. The court in *Stiltjes* found:

> Under state and federal law [pesticide] operators are charged with knowledge of the dangers associated with and safe use of pesticides. See OCGA § 2–7–99(b)(1)(A); Rules of Georgia Department of Agriculture Pesticide Use and Application § 40–21–3.02 (1978). Under federal law, commercial applicators of pesticides are required to "demonstrate practical knowledge of the principles and practices of pest control and safe use of pesticides," 40 CFR § 171.4(b), including a knowledge of such safety factors as "(a) Pesticide toxicity and hazard to man and common exposure routes; (b) Common types and causes of pesticide accidents; (c) Precautions necessary to guard against injury to applicators and other individuals in or near treated areas; ... (e) Symptoms of pesticide poisoning." 40 CFR 171.4(b)(1)(ii).

343 S.E.2d at 719. The plaintiff's decedent in *Stiltjes* died of an allergic reaction to pyrethrins contained in a pesticide being applied at his residence. Absent knowledge of pyrethrins, the applicator could not have conformed to the regulations. Under the regulations governing pesticides, the pesticide manufacturer was entitled to the irrebuttable presumption that the applicator had knowledge of the hazards of pyrethrins.

---

**5.** The evidence could also be construed to support the contrary conclusion. We note that Northern's liability for Stuckey's injuries could be premised on actual or constructive knowledge.

Propane retailers are governed by the Rules of the Safety Fire Commissioner,[6] which provide in part:

> Installation and replacement of gas piping, gas utilization equipment or accessories and repair and servicing of equipment shall be performed only by a qualified agency. The term "qualified agency" means any individual, firm, corporation or company which either in person or through a representative is engaged in and is responsible for (a) the installation or replacement of gas piping or (b) the connection, installation, repair, or servicing of equipment, who is experienced in such work, familiar with all precautions required, and has complied with all the requirements of the authority having jurisdiction.

National Fire Protection Association (NFPA) 54 at 1.4 (1984), *adopted in* Rule of the Safety Fire Commissioner 120–3–16–.07 (1980). The Rules provide for the licensing of LP gas retailers and charge them with the knowledge and ability to store, transport, and install LP gas safely. *See* NFPA 58 at 1.6.1.1 (1984) ("In the interests of safety, all persons employed in handling LP gases shall be trained in the proper handling and operating procedures."). The LP regulations required that Northern be able to install and repair piping in such a way as to prevent gas leaks. *See* NFPA 54. Northern was required to transport LP gas in a safe manner. *See* Rule of Fire Safety Commissioner 120–3–16–.08(2)(e), (m), and (q). The LP gas regulations do not require retailers to have knowledge of the various chemical properties of LP gas. Unlike the intermediary in *Stiltjes*, Northern could have conformed to the regulations even if it lacked knowledge

of odor fade. Upon reading the entire text of the regulations governing Northern, we conclude that they do not charge Northern with knowledge of odor fade. Therefore, Dixie is not entitled to the irrebuttable presumption that Northern had actual knowledge of odor fade.[7]

### C. Jury Instructions

■ The trial court instructed the jury, "if you find that either or both defendants had the requisite knowledge, actual or constructive, that ethyl mercaptan could fade away under conditions prevailing at the Stuckey house and had the ability to distribute this knowledge, then that defendant had a duty to warn of this problem." Given that Dixie's failure to warn Stuckey was undisputed, this instruction erroneously left the jury no choice but to find Dixie liable if Dixie had knowledge of odor fade, regardless of any of the factors discussed in Section 388, Comment n.[8] *See section B.2, supra.* Dixie properly objected to this charge as preventing the jury from considering its position as a bulk supplier and Northern's position as an intermediary allegedly with actual knowledge. *See* Fed.R. Civ.P. 51 ("No party may assign as error the giving or failure to give an instruction unless that party objects thereto ... stating distinctly the matter objected to and the grounds of the objection.").

As discussed previously, Dixie's duty to warn may be satisfied in some circumstances by the presence of an intermediary with actual knowledge. Comment n suggests several factors that must be considered in determining whether knowledge on Northern's part relieved Dixie of its duty to

---

**6.** Such rules are law in Georgia. *See* O.C.G.A. § 25–2–4 (1982).

**7.** Another irrebuttable presumption of knowledge arises when the content of the warning is "common knowledge." *See Eyster,* 206 S.E.2d at 671 ("the danger of aluminum-copper connection was common knowledge"). Although the propane industry may have been generally aware of the phenomenon of odor fade, the evidence does not support a finding that it was "common knowledge" in the sense used by the *Eyster* court.

**8.** The charge also required the jury to find each defendant had "the ability to distribute this knowledge." The charge does not specify *to whom* that knowledge was to be distributed. In other words, the jury may have found that Dixie's knowledge coupled with its ability to tell Northern imposed a duty to warn on Dixie. A linchpin of Dixie's argument is the impracticality of its providing the required warning to Stuckey, the ultimate consumer to whom the duty would be owed. Because of the incomplete wording of the jury charge, we cannot conclude that the jury found as a fact that Dixie had the actual ability to warn Stuckey.

warn. We conclude that a proper balancing of these factors entitled Dixie to an instruction that it had no duty to warn if (1) Northern had actual knowledge of odor fade; (2) Dixie had no practical and effective means of warning consumers about odor fade; and (3) the degree of danger posed by a lack of warning was not extreme.[9] Evidence was presented that Northern had actual knowledge of odor fade. Evidence was also presented from which the jury could have concluded that Dixie could not have practicably and effectively warned Stuckey. Dixie owns a pipeline. It transports LP gas in bulk to LP gas wholesalers and retailers. It never holds title to the gas it carries and has no means of attaching a warning of any kind to the gas or containers that carry the gas to the ultimate consumers. Finally, the evidence did not necessarily show that the general danger posed by the lack of warning about odor fade was extreme.

■■■■ This Court will grant a new trial on the basis of an erroneous jury instruction "[o]nly if the trial judge's instructions to the jury, taken as a whole, give a misleading impression or inadequate understanding of the law and the issues to be resolved." *Bass v. Intern. Brotherhood of Boilermakers*, 630 F.2d 1058, 1062 (5th Cir.1980). Dixie timely objected to the court's instruction on Dixie's duty to warn on the grounds that it precluded the jury from considering Northern's status as an intermediary with knowledge and Dixie's status as a bulk supplier who would have great difficulty providing an effective warning. Because the instruction gave the jury the misleading impression that neither of these factors was relevant to the crucial question of Dixie's duty to warn, we hold that Dixie is entitled to a new trial. *Cf. Ionmar Compania Naviera, S.A. v. Olin Corp.*, 666 F.2d 897, 904 (5th Cir.1982) (in maritime failure to warn case, judgment vacated and remanded where findings entered by the court after trial did not indi-

cate level of knowledge held by intermediary, thereby precluding effective appellate review of judgment).

## D. Corrected Verdict

■■■■ The district court instructed the jurors that they could apportion damages between Dixie and Ferrell. The jury returned a verdict of $120,000 against Dixie and $680,000 against Ferrell. The instruction allowing this apportionment was erroneous under Georgia law. *See, e.g., Union Camp Corp. v. Helmy*, 258 Ga. 263, 367 S.E.2d 796, 800 (1988). The court realized its error and corrected the verdict by awarding $800,000 jointly and severally against Dixie and Ferrell.

### 1. *Applicable Law*

■■■■ Initially, we note that federal law governs our disposition of the objection to the district court's adjustment of the jury verdict. *See Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (in diversity cases procedural questions are governed by federal law). Whether the district court erred in adjusting the verdict rather than granting a new trial is a procedural question. *See Lowe v. General Motors Corp.*, 624 F.2d 1373 (5th Cir.1980). In *Lowe*, this Court considered a trial court's remitting of an excessive jury verdict. It held that state law determined the substantive question of excessiveness, but "a Federal standard applies to determine the slightly different procedural question of whether a Federal District Court, sitting in diversity, should automatically grant a new trial on the basis of excessive damages." *Id.* at 1383; *see also Pate v. Seaboard R.R., Inc.*, 819 F.2d 1074, 1082 (11th Cir.1987) ("whether erroneous jury charges necessitate a new trial is a procedural matter governed by federal law").

Georgia law governs the type of liability a federal court imposes on a civil defendant in a diversity case. In this case, the dis-

---

9. Obviously, the jury found that in Stuckey's particular case a warning would have prevented his injuries. However, the degree of danger posed by a lack of warning should be evaluated in light of the general frequency of accidents which will occur absent a warning. The frequency of accidents will vary with the inherent dangerousness of the product and the likelihood the warning will change the consumer's behavior.

trict court conformed the verdict to make it consistent with Georgia substantive law on joint and several liability. *See Helmy,* 367 S.E.2d at 800. However, federal law governs the propriety of the district court's decision to correct the verdict rather than to order a new trial. *See Lowe, supra; Pate, supra; Faison v. Nationwide Mortgage Co.,* 839 F.2d 680, 687 (D.C.Cir.1987), *cert. denied sub nom. Boddie v. Faison,* — U.S. ——, 109 S.Ct. 70, 102 L.Ed.2d 46 (1988) (local law determined apportionment of damages, but federal law determined correction of verdict from several to joint liability).

We realize that a Georgia state court does not have the option to correct the verdict rather than order a new trial. *See MARTA v. Tuck,* 163 Ga.App. 132, 292 S.E.2d 878, 883 (1982) (trial court may not correct unauthorized several verdict by aggregating damages and awarding a joint verdict). Although we are bound by Georgia substantive law on joint and several liability, "[t]he incidents of jury trial are for the federal courts to decide for themselves, guided by the Seventh Amendment, and are not a matter on which state law should be given any effect." 11 Wright & Miller, Federal Practice and Procedure § 2802 at 31. The decision to avoid the burden of a new trial may advance federal interests. *See McHann v. Firestone Tire & Rubber Co.,* 713 F.2d 161, 166 n. 10 (5th Cir.1983) (under *Erie* analysis "the efficient use of court time and resources is a federal concern legitimately within the reach of the federal authority"); *Faison,* 839 F.2d at 687 (modification of verdict preferred when "a new trial, even if restricted to the issue of compensatory damages, would be unduly burdensome"). We are not bound by Georgia's failure to pro-

vide its trial courts with a procedure for modifying a jury verdict under the facts of this case.

### 2. *Merits of Verdict Correction*

▇▇▇ Dixie cannot complain about the original verdict or its correction. Dixie was the party who convinced the court, over Ferrell's objection, that apportionment was proper. *See United States v. Gray,* 626 F.2d 494, 501 (5th Cir.1980) *cert. denied,* 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1981) ("a defendant who asks for an instruction will not be heard to complain about the instruction on appeal"); *accord United States v. Easterly,* 444 F.2d 1236, 1240 (5th Cir.1971). Dixie argues somewhat disingenuously that it is not objecting to the instructions but to the correction. The court's correction was the direct and foreseeable result of Dixie's clearly erroneous jury charge.[10]

▇▇▇▇ Ferrell argues that the correction was not authorized by Fed.R.Civ.P. 60(a), which states in relevant part:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.

Ferrell claims that under Rule 60(a), a court can change a verdict only in case of "clerical error." In this case, the court erred in instructing the jury. The jury did not err at all, in the sense that its verdict was consistent with the instructions it had received. Ferrell argues that therefore the court's "correction" went beyond the mere clerical, and Ferrell requests a new trial.[11]

---

**10.** Dixie asked for the apportionment charge very late in the proceedings, and the district court explained that time constraints forced it to rely on Dixie's representations. At the time of the suggested change in the verdict form, counsel for Stuckey accurately stated, "[I]t bothers me mightily that [Dixie] didn't speak up and raise that issue in this charge conference and it sounds to me a little bit like there might be a possibility that we're getting sandbagged here in terms of a verdict that might not stand up on appeal." Record Vol. 15, p. 10.

**11.** Although Ferrell requests a new trial, the only possible appropriate relief would be reinstatement of the $680,000 verdict. Ferrell may complain about the correction which tacked on $120,000 to Ferrell's initial liability. However, Ferrell has no right to complain about the initial award made by the jury. Although the jury instructions that resulted in the initial $680,000 award against Ferrell were erroneous as to apportionment, that error actually benefited Ferrell by allowing part of the damages to be assumed by another party. A defendant jointly

Few cases from this Court are instructive on the boundaries of the court's power to adjust a jury's verdict. In *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945 (5th Cir.1981), the jury awarded damages of $30,956.47 against each of four defendants—this amount was exactly one-quarter of the amount of damages claimed by the plaintiff. Under the jury instructions and the law, the jury could only have found the defendants jointly and severally liable. The district court reasoned that the jury was confused by the instructions and should have awarded the full amount claimed, $123,825.89, jointly and severally against all defendants. This Court affirmed the correction, holding "that such an error occurred is so clear that it is not unlike a clerical error which the court can correct under Fed.R.Civ.P. 60(a)." 636 F.2d at 963. *Cf. United States f/u/b/o Miss. Rd. Supply Co. v. H.R. Morgan, Inc.*, 542 F.2d 262, 269 (5th Cir.1976) (where jury obviously made mathematical error in verdict, Rule 60(a) was properly used to reduce the award). However, in *G.A. Thompson*, this Court never clarified whether the correction was proper under Rule 60(a) or some general equitable power of the court.

Ferrell attempts to distinguish *G.A. Thompson* by noting that in this case the court corrected its own error, while in *G.A. Thompson* the court corrected a jury error. Ferrell claims that no case employs Rule 60(a) to correct a court's erroneous jury charge. Stuckey, however, argues that the jury's intent was clear—it found that he suffered a total of $800,000 of injury. Given Georgia law on joint and several liability, Ferrell is liable for all Stuckey's damages. *See Tuck*, 292 S.E.2d at 883. The court's correction, he claims, reflects exactly that intent. Under such reasoning, the court's correction seems no more intrusive

than that conducted in *G.A. Thompson*. Although this is a case of first impression, both *G.A. Thompson* and *Morgan* indicate that a court has the power, when appropriate, to go beyond a Rule 60(a) correction of mere "clerical errors." *See also Aquachem Co., Inc. v. Olin Corp.*, 699 F.2d 516, 520 (11th Cir.1983) ("A district court may, within its sound discretion, amend a special verdict after it is rendered to make it conform to the jury's obvious, but unexpressed intention.").

The *G.A. Thompson* decision indicates that "the Federal Rules of Civil Procedure do not completely describe and limit the power of the federal courts." *G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 871 F.2d 648 (7th Cir.1989) (*en banc*) (federal court may compel represented parties to attend pretrial conference). A district court's equitable power to conform a verdict to law is illustrated in *Dextone Co. v. Building Trades Council*, 60 F.2d 47 (2d Cir.1932). In *Dextone*, the district court charged the jury in a conspiracy case that it should apportion damages against two groups of conspirators according to the time when they entered the conspiracy. In accordance with the instruction, the jury awarded $11,000 against the initial group of conspirators and $2,000 against a group who joined the conspiracy later. The Second Circuit held that the instructions were erroneous; a group who joins an existing conspiracy is jointly and severally liable for all damages resulting from the conspiracy. It corrected the verdict by assessing the full amount of damages against all parties, explaining:

> The verdict therefore established the guilt of all the defendants and the total damages they caused the plaintiff by their wrongful combination. Hence the jury's attempt to apportion to the West-

---

liable under the law may not complain about a several award of damages. *See Hooks v. Vet*, 192 F. 314, 315 (5th Cir.1911) ("If, however, we concede the contention of the plaintiff in error that the verdict should have been joint, and not several, and that it was error to enter the several judgment on the verdict, it seems that it was certainly error without injury"), *followed in Siebrand v. Gossnell*, 234 F.2d 81, 93 (9th Cir. 1956) ("Even if Siebrand Bros. and Carroll, un-

der Arizona law, were joint-tortfeasors there would be no error of which Siebrand can complain relating to apportionment of the verdict [because] [a]s a result of the apportionment each has been subjected to a smaller judgment") (citing *Ohio Valley Bank v. Greenebaum Sons Bank & Trust Co.*, 11 F.2d 87, 90 (4th Cir.1926)). *Accord* Prosser and Keeton, Torts § 47 at 330 (5th Ed.1984) ("A defendant, however, usually is not permitted to complain at all.").

chester group only a part of the damages should have been ignored as surplusage, and judgment should have been entered for the full amount against all the wrongdoers. Such a defect in the verdict may be cured either by the trial court or by the appellate court without the granting of a new trial.

*Id.* at 49; *see also Freid v. McGrath*, 135 F.2d 833, 834 (D.C.Cir.1943) (jury verdict of $425 against each of two defendants corrected to $850 against both so "as to make it conform to correct legal principles" of joint and several liability); *accord Decato v. Travelers Ins. Co.*, 379 F.2d 796, 798 (1st Cir.1967) (cited with approval in *Moreau v. Oppenheim*, 663 F.2d 1300, 1311 (5th Cir. 1981), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982)); *Rocky Mountain Tool & Machine Co. v. Tecon Corp.*, 371 F.2d 589, 598 (10th Cir.1966); *Horton v. Moore–McCormack Lines, Inc.*, 326 F.2d 104, 107–08 (2d Cir.1964). Case law and common sense indicate that the district court did not exceed the scope of its power in adjusting the verdict to conform to Georgia law.

In affirming the adjustment made to the verdict, we emphasize that we have not reexamined any of the facts considered or found by the jury. *Cf. Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1955) (trial judge dissatisfied with amount of damages awarded may not order additur). To the contrary, we affirm the jury's unambiguous finding that Stuckey suffered $800,000 in compensable injuries. We do not invade the fact-finding province of the jury by assessing all that damage against Ferrell by simple operation of Georgia law. *See Hinshaw v. Doffer*, 785 F.2d 1260, 1269 (5th Cir.1986) (in 42 U.S.C.A. § 1983 action, officer found 65% liable was responsible for 100% of damages when verdict against other officer found liable was reversed).

### E. Admission of NLPGA Documents

■ The court admitted, over Ferrell's objection, documents purporting to be minutes of National Liquified Petroleum Gas Assoc. ("NLPGA") meetings which demonstrated the general awareness of Ferrell's

predecessors and the LP gas industry of the odor fade phenomenon. Ferrell claims these documents, consisting of cut and pasted excerpts of committee meetings, were never properly authenticated. The only direct evidence offered to authenticate the documents came from the testimony of one of the committee members who said the documents "looked like he expected them to look." Fed.R.Evid. 901(a) provides:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

This Court may reverse the district court's decision only if it abused its discretion. *See Bury v. Marietta Dodge*, 692 F.2d 1335, 1338 (11th Cir.1982). Ferrell offered no evidence to counter the minimal showing by Stuckey that the documents were authentic. The testimony at trial by those serving on NLPGA committees was consistent with the contents of the meeting excerpts. Sufficient evidence at trial was presented "to support a finding that the matter in question [was] what its proponent claim[ed]." In addition, viewing the other evidence on odor fade as a whole, Ferrell was not prejudiced by the admission of the documents.

### F. Closing Argument

■ In his closing argument, counsel for Stuckey argued that "if you give Oscar Stuckey what he is entitled to in this case because of those failures to warn, within 24 hours of the time that you came back every single one of these 37 [propane] companies will know it." Counsel ignored the court's order to cease such comments and continued, "I encourage you, ladies and gentlemen, to send that word within 24 hours." Ferrell and Dixie moved for a mistrial on the basis that this, in effect, was a request for punitive damages. A request for punitive damages made in the closing arguments of a case where such damages are unavailable is error. *See Evers v. Equifax, Inc.*, 650 F.2d 793, 795 (5th Cir.1981) (af-

firming new trial granted by trial court after second request of jury to "award sufficient damages to prevent a recurrence of similar incidents."). In this Circuit, "a district court's denial or grant of a new trial is within its discretion and is ordinarily nonreviewable." *Id.* at 796.

A complete examination of Stuckey's closing arguments does not reveal reversible error. Counsel made it clear that a "message should be sent," but he also made it clear that an award of only compensatory damages would suffice to send that message. His argument for deterrence was not necessarily an argument for punitive damages. Compensatory damages serve a very strong deterrent function. *See Memphis Comm. School Dist. v. Stachura*, 477 U.S. 299, 310, 106 S.Ct. 2537, 2544, 91 L.Ed.2d 249 (1986) ("damages that compensate for actual harm ordinarily suffice to deter"). Counsel told the line fairly closely, but the district court did not abuse its discretion in not declaring a mistrial.

## G. Punitive Damages

■ The district court ruled that Stuckey could not amend his complaint a third time to add a prayer for punitive damages. Stuckey offers no valid explanation as to why punitive damages were first prayed for after almost three years of discovery. He claims that he lacked the knowledge to make the claim earlier, but an examination of his first complaint reveals allegations sufficient upon which to have based a request for punitive damages. The court also ruled that it would not, in conformity with the proof at trial, instruct the jury that it could award punitive damages. Since the evidence did not show Dixie and Ferrell's culpability rose to a level sufficient to justify an award of punitive damages under Georgia law, *see BLI Construction Co., Inc. v. Debari*, 135 Ga. App. 299, 217 S.E.2d 426, 428 (1975) (even gross negligence will not support an award of punitive damages), no instruction was warranted. The district court did not abuse its discretion in denying Stuckey's motions.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the jury's finding of liability as to Dixie and REMAND for a new trial. We AFFIRM the judgment entered against Ferrell.